Sharan Ann WILLIAMS, Appellant

v.

The STATE of Texas.

No. PD–0446–06.

Court of Criminal Appeals of Texas.

Oct. 3, 2007.

Anthony C. Odiorne, Wichita Falls, for Appellant.

John W. Brasher, Assistant District Atty., Wichita Falls, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which, PRICE, WOMACK, JOHNSON, KEASLER, HERVEY and HOLCOMB, JJ., joined.

We granted appellant's petition for discretionary review to examine the culpable mental state of recklessness.

Appellant was convicted of injury to a child and sentenced to fifteen years' imprisonment after her two children died in an accidental house fire while her boyfriend was babysitting them. We hold that the evidence in this case was legally insufficient to support her conviction under Section 22.04 of the Texas Penal Code.[1] The court of appeals erred in concluding that the State proved the criminal offense of reckless injury to a child when the evidence showed that appellant took her children from their grandmother's house (which had working utilities) to her boyfriend's temporary home (which did not have working utilities) and left them under her boyfriend's care with a lit candle in the bedroom.[2] The State's proof of these

---

1. Tex. Penal Code § 22.04(a). The offense of Injury to a Child, Elderly Individual, or Disabled Individual, states, in pertinent part, "A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual ... serious bodily injury."

2. *Williams v. State*, 190 S.W.3d 700 (Tex. App.-Fort Worth 2005).

facts—proof beyond a reasonable doubt—did not establish a criminally culpable reckless state of mind. Further, the State did not prove that appellant's acts or omissions caused the death of her children.[3]

## I.

Two of appellant's children, Ujeana, age seven, and Precious, age eight, died in a house fire in the early morning hours of October 5, 2002. Ujeana, Precious, and appellant lived with appellant's mother, Zula Mae Scott, who routinely cared for the young girls. Occasionally the girls stayed with their father, Charles Leon Williams, Jr. Sometimes they stayed with appellant and her boyfriend, Herbert Ronald Bowden, in his "home." Bowden lived in an altered duplex with both halves of the house combined into a single unit. It was a four-room structure, but it had no kitchen or bathroom, no working utilities, and very little furniture. In Bowden's bedroom there was a bed, as well as a dresser under the window, and a chair in front of the nailed-up door to the outside. There was a couch in the living room. The house was, according to Bowden, "somewhat trashy." There was indeed trash on the floor, mainly in the living room.

Bowden lived in this makeshift home with permission, and he paid a nominal rent. He intended to live there until he saved enough money from his new job at Bennigan's restaurant to afford a proper apartment. About two weeks before the fire, Zula Mae learned that appellant and Bowden were taking the children to the duplex. She warned them both that "it was too dangerous to be taking them down there and burning candles," in part because of the risk of a house fire.

Nevertheless, after he got off work on October 4, 2002, Bowden went to Zula Mae's house to pick up appellant and her girls. Zula Mae was not yet home from work. The four walked to his duplex. Appellant went out to get cigarettes and ran into the girls' father, Charles Leon Williams, Jr., in the parking lot of the store. He asked appellant where the girls were. She told him that they were "at home," which meant, to Mr. Williams, "with Zula Mae." Mr. Williams saw appellant leave the store in a car with a man who was not Bowden.

When appellant returned to the duplex, she told Bowden that she wanted to go out with friends, and he agreed to watch the girls. He dressed them in his sweatshirts to keep them warm, and then he and appellant put the girls to bed in his bedroom. They placed a burning candle in an aluminum pie plate for light[4] because Bowden did not want the girls to be left "in the dark." Bowden said that he and appellant "were sitting there talking and um, and uh, soon as we got through talking I took the candle and sat it over there in the corner at the edge of the bed. I sat it there." The candle was closer to the wall than the bed. After appellant left, Bowden checked on the girls who were asleep with the candle still lit. "I don't know why I didn't

---

3. Appellant's sole question for review reads:
 Did the court of appeals err in holding that the evidence presented against appellant was legally and factually sufficient to support a conviction for recklessly causing serious bodily injury to her children?
 Because we find the evidence legally insufficient, we do not address the question of factual sufficiency.

4. The evidence was mixed on who lit the candle. In his first statement, Bowden said he lit it, and, in his second statement, he said appellant did. Appellant, in her statement, said that she lit it.

think to blow the candle out, I just didn't want them to be in the dark."

Bowden said that he left the house only once-around 9:30-to get a cigarette from his neighbor Preston. Then he "ran on back down the street and went on back in the house and went and checked on 'em and they were still sleep. And I went and sat in the living room on the couch. And then I went and got up and checked on 'em again and that was I'm saying that was about 10 o'clock or so."

Bowden finally fell asleep on the living-room couch. His neighbor Preston woke him up about 11:00 p.m. He was outside "hollering" and "asking about Sharan 'cause apparently he had loaned her a couple of dollars or something and he needed it. So uh, I was telling him she wasn't there." Bowden came back inside because it was "cool" outside, and "I didn't have on any shoes or nothing and I went out there just in my socks." He checked on the girls again and then once more fell asleep on the couch.

Around 1:00 a.m., Bowden woke up to loud screams and saw that the bedroom where the girls were sleeping was on fire. When he looked in the "open" door all he could see "was flames and smoke."[5] He said he got down close to the floor, but he "could barely even see the bottom of the bed you know? And it was that much smoke in there." He could still hear the girls screaming, and he was "hollering, calling their names, but they wasn't responding like they heard my voice." He ran out of the front door, and "I went around to the side window and uh, knocked it out. But flames were coming out of it." When he could not get in the window, he ran around to the boarded-up

exterior bedroom door and tried to pull it open, but again he could not get inside.

Wichita Falls Police Officer Jonathan Lindsay was the first emergency responder. When he arrived, he saw Bowden with a towel wrapped around one of his hands, crying "my babies are inside, my babies are inside." Bowden was "frantic." By the time the fire department arrived, the house was "fully involved" with flames, and the firemen were unable to enter it. The children never got out.

Appellant, who had been told about the fire, arrived back at the scene as the fire department was extinguishing the blaze. Bowden—who had cut his hand when he broke the window trying to get to the children—was briefly checked out by medical personnel. He had no burns or cough.

Jim Graham, the Assistant Fire Marshal for the Wichita Falls Fire Department, talked to Bowden at the scene. Bowden told him about the candle, about waking up to find the bedroom on fire, and about how he tried to enter the room first through the open bedroom door, then through the outside window, and finally through the boarded-up back door.

A couple of hours later, Officer Ginger Harrill took statements from both Bowden (who was still in his socks) and appellant. They were both cooperative. Officer Harrill took a second statement from Bowden a couple of days later. Regarding these two statements, Officer Harrill said,

> Basically he was—both statements were consistent, that he was asleep on this couch, and this door goes into this front bedroom, and the girls were sleeping in this rear bedroom, and he woke up on this couch and heard them screaming and goes to this door, which was open,

5. There were two interior doors into the bedroom. According to Bowden, one was open; the other, which did not have a doorknob, was shut. This latter door opened inward, but the girls could not open it, so they always used the other door.

and at that point he could see the doorway into this room and see the room glowing.

When questioned about whether he was at Preston's house when the fire started, Bowden said, "No, no, absolutely not." He stressed that he has always looked out for the kids-and that he was there, asleep, when the fire broke out. "Their safety has always been a factor with me.... I been around them for as long as I been around their mother. And you know, I'm not their ... father but it was just like they were my children you know?" Repeatedly pressed about whether he left the children alone, he stated

> There's no way I would just leave, leave them in the house like that. Not them or anybody else's kids. I wouldn't even have to know 'em. I just wouldn't do it. Kids can't, they can't take care of they self.

He reiterated that he was not at Preston's when the fire started, and that he was willing to take a polygraph. He concluded,

> I, you know I haven't lied to you about anything concerning that. I mean it's hard enough to admit that these kids died in my care you know? I couldn't, I couldn't have left them like that. If anything I would've took 'em with me. I would've woke 'em up and took 'em with me.

Appellant's statement related her activities that night. For the most part, her statement did not make much sense. It was fractured and incoherent. She stated that as soon as she, Bowden, and the girls arrived at the duplex, she went out to buy cigarettes. When she returned, she "hung out" for a while with the girls and Bowden. Then she lit a candle in the bedroom and put the girls to bed. Around 8:30 p.m., she went out to buy chips and Little Debbies for the girls-something she was supposed to have done on her first trip to the store. She mentioned a cast of characters that she saw or talked to during the evening: Paul Taylor, who gave her change for the girls' snacks; Judy, the owner of Lucky One Stop; a "young Spanish guy" who gave her a ride in a blue van; Christine, who lives down the street; Preston, from whose house she called Jerry, Christine's cousin; Easy B (AKA Anita Gibson) and Dee, who live at the Budget Motel; Shewe, who "got into it" with Easy B at the Budget Motel; an unknown man in a van, "I don't know his name, he just gave me a ride"; BL (AKA Lewis) and Pine, who told her the "girls just got burned up." Investigator Harrill asked appellant about Ujeana and Precious staying at Bowden's place:

> Harrill: Ok. Uh, how often do you and the girls stay down there?
>
> Williams: Uh, Uh, We go down there sometimes ... We don't stay down there, we slept down there a couple of times.
>
> Harrill: Um hmm.
>
> Williams: 2 or 3 times. But we don't ... Um, Like Mama said, we should've brought 'em home.
>
> Harrill: Well I'm not trying to be harsh but that's gonna come up. Why didn't you just leave 'em at your mom's?
>
> Williams Well at the time Mama wasn't there.
>
> Harrill: Ok.
>
> Williams: Mama wasn't there. 'Cause Mama don't make it home until after 5:30.'

Both appellant and Bowden denied drinking or getting high that night.

Assistant Fire Marshal Graham investigated the fire and concluded that it was an accident:

> There was absolutely nothing in this room that would lead me, as an investi-

gator, to believe that this fire was in any way intentionally set. We're looking at the accidental introduction by a human of some—some open flame. Take that with Mr. Bowden's statement of having a candle placed in there, that's exactly what we would have seen. Some material got too close to the candle. As the girls were described sleeping on the bed, changing places, moving over, it's quite likely—the most likely scenario was a sheet, maybe clothing, material used for—wrapped under their head for a pillow gets knocked—either knocked off the bed or hangs off the bed. A[t] this point the candle can ignite it.

—

The cause of the fire was, without question, the introduction of an open flame to the combustible material in the corner of that room. The only known open flame or alleged open flame to be there was the candle that was put there for light that night.

Marshal Graham said that he also investigated why the girls could not get out of the bedroom. From the burn patterns, he determined that one of the two front doors "was opened during this fire." The burn patterns suggested both bedroom doors were closed for most of the fire. The one Bowden said that he had opened could have been opened only "momentarily." But Marshal Graham surmised that this door had probably never been opened because Bowden had no symptoms of burns or smoke inhalation. The fire burned at 1,100 or 1,200 degrees, and, according to the marshal, if Bowden had opened that door during "full room involvement," as he said he did, he would have suffered "ill-effects. So it's just—it is more likely he never opened that doorway." Other parts of Bowden's statement—breaking the window and trying to open the boarded-up door—were corroborated by the physical evidence. Although Marshal Graham could not specifically say that Bowden had been on the couch when the fire started, he did acknowledge that Bowden's shoes were found next to the couch; and that he was outside the burning house in only his socks.

Bowden and appellant were each indicted for two counts of reckless injury to a child. Bowden was alleged to have committed the two offenses "by leaving [each girl] in a room without adult supervision with a candle burning."[6] Appellant was alleged to have committed the offenses by either (1) taking the girls from a house with working utilities to a building without them and leaving the children in a room with a lit candle, or (2) leaving them asleep in a building without utilities with a burning candle instead of taking them to a house with working utilities. These were the specific acts that the State relied upon to prove recklessness.

The two cases were consolidated for trial, and both Bowden and appellant were convicted. Bowden was sentenced to ten years' imprisonment on each count, and appellant was sentenced to fifteen years' imprisonment on each count.

On appeal, appellant claimed that the evidence was legally and factually insufficient to prove her guilt. The court of appeals rejected this claim and held, in essence, that a rational trier of fact could conclude that the act of taking children from a home with utilities to one without utilities and leaving them in a bedroom with a lit candle is sufficient to create the known risk of death or serious bodily injury to those children, even if another adult caretaker is present.[7]

---

6. *Bowden v. State*, 166 S.W.3d 466, 470 (Tex. App.-Fort Worth 2005, pet. ref'd).

7. *Williams*, 190 S.W.3d at 714.

## II.

 In assessing the legal sufficiency of the evidence under *Jackson v. Virginia*,[8] "we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt."[9] Under a legal sufficiency review, "our role is not to become a thirteenth juror. This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder."[10] Thus, reviewing courts give deference to " 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' "[11]

 A reviewing court's duty, however, does require it to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged. If the evidence establishes precisely what the State has alleged, but the acts that the State has alleged do not constitute a criminal offense under the totality of the circumstances, then that evidence, as a matter of law, cannot support a conviction.

 To sustain a conviction for reckless injury to a child the evidence must prove that a defendant recklessly, by act or omission, caused serious bodily injury to a child.[12] Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct.[13] The State must prove that a defendant caused a child's serious bodily injury with the requisite criminal intent.[14] Under the Penal Code,

> A person acts recklessly, or is reckless, with respect to ... the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the ... result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.[15]

 Criminal recklessness must not be confused with (or blended into) criminal negligence, a lesser culpable mental state. With criminal negligence, the defendant *ought to* have been aware of a substantial and unjustifiable risk that his conduct could result in the type of harm that did occur, and that this risk was of such a nature that the failure to perceive it was a gross deviation from the reasonable stan-

---

**8.** 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**9.** *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim. App.2007) (citing *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781).

**10.** *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim.App.1999).

**11.** *Hooper v. State*, 214 S.W.3d at 13 (quoting *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781).

**12.** Tex. Penal Code § 22.04(a)(1) ("A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual ... serious bodily injury").

**13.** *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim.App.1985).

**14.** *See Cook v. State*, 884 S.W.2d 485, 490–92 (Tex.Crim.App.1994).

**15.** Tex. Penal Code § 6.03(c).

dard of care exercised by ordinary people.[16] Criminal negligence depends upon a morally blameworthy failure to appreciate a substantial and unjustifiable risk while recklessness depends upon a more serious moral blameworthiness—the actual disregard of a known substantial and unjustifiable risk.

At common law, "the word 'reckless' or 'recklessly' was commonly used in expressing the concept of criminal negligence."[17] However, Professor Perkins notes that, in most modern penal codes, the two concepts have been distinguished and separated:

> "recklessness" and "criminal negligence" represent different mens rea concepts .... [but they] have one component in common. Each requires conduct which represents a gross failure to measure up to the reasonable-person standard of

care. Assuming such conduct, if the actor was aware of the risk he was creating, and consciously disregarded that risk, however much he may have hoped that no harm would result, he was acting recklessly.[18]

 Thus, "[a]t the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct[.]"[19] As has often been noted, "[m]ere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be," do not suffice to constitute either culpable negligence or criminal recklessness.[20] Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it.[21] Such a "devil may care" or "not giv-

---

16. TEX. PENAL CODE § 6.03(d). *See also Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 20 (Tex.1994). In *Moriel,* the Texas Supreme Court discussed the legal standard for proving entitlement to punitive damages for "gross negligence" and noted,

> Criminal negligence and recklessness differ from one another only in terms of mental state. A criminally negligent defendant "ought to be aware" of a "substantial and unjustifiable" risk, while a reckless defendant is subjectively aware of an identical risk but disregards it. Importantly, nobody is subject to criminal punishment if they are aware of a relatively minor risk or simply negligent.
>
> It should not be surprising that the civil definition of gross negligence and the criminal definition of recklessness are virtually identical. Both serve the same purpose—identifying when it is appropriate to punish an individual for consciously disregarding an unjustifiable risk.

*Id.*

17. ROLLIN M. PERKINS AND RONALD N. BOYCE, CRIMINAL LAW 849 (3rd ed.1982).

> While it "is elementary that to support a conviction of crime, the accused must be guilty of negligence in a higher and grosser degree than is sufficient to support a judgment in a civil case," some difficulty has

been encountered in expressing this greater fault, and the trend has been in the direction of employing the word "reckless" for this purpose.

*Id.* at 846.

18. *Id.* at 850; *see generally Pagotto v. State,* 127 Md.App. 271, 732 A.2d 920 (1999) (discussing and distinguishing the varying degrees of civil and criminal negligence; evidence legally insufficient to establish defendant's "gross negligence"); *see also People v. Rodriguez,* 186 Cal.App.2d 433, 8 Cal. Rptr. 863, 867 (1960) ("in order to impose criminal liability for a homicide caused by negligence, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless"; evidence legally insufficient to establish gross negligence or recklessness) (quotations and citations omitted).

19. *Lewis v. State,* 529 S.W.2d 550, 553 (Tex. Crim.App.1975).

20. *People v. Carlson,* 176 Misc. 230, 26 N.Y.S.2d 1003, 1005 (N.Y. County Ct.1941).

21. Criminal recklessness is of "a gross and flagrant character, evincing reckless disre-

ing a damn" attitude toward the risk distinguishes the culpable mental state of criminal recklessness from that of criminal negligence, which assesses blame for the failure to foresee the risk that an objectively reasonable person would have foreseen.[22] "Those who are subjectively aware of a significant danger to life and choose, without justification, to engage in actions (or in some cases inactions) that threaten to bring about that danger have made a calculated decision to gamble with other people's lives."[23] This combination of an awareness of the magnitude of the risk[24]

gard of human life, or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of [a conscious] indifference to consequences; or which shows such wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them." *Cannon v. State*, 91 Fla. 214, 107 So. 360, 363 (Fla.1926) (quoting *Florida South. Ry. Co. v. Hirst*, 30 Fla. 1, 11 So. 506 (Fla.1892) (applying definition used by civil courts to award punitive damages as the measure of gross negligence for criminal manslaughter charges)).

**22.** TEX. PENAL CODE § 6.03(d) ("A person acts with criminal negligence ... with respect to ... the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that ... the result will occur.").

**23.** James Gobert, *Searching for Coherence in the Law of Involuntary Manslaughter: The English Experience*, 6 Crim. L.F. 435, 454 (1995).

**24.** In *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex.1994), the Texas Supreme Court held that the evidence was legally insufficient to support a jury verdict that the defendant had been grossly negligent for purposes of the imposition of punitive damages and explained,

Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. Extreme risk is a function of both the magnitude and the probability of the anticipated injury.... [T]he "extreme risk" prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather "the likelihood of serious injury" to the plaintiff.

*Id.* (citations omitted). Our sister court summarized the two prongs of gross negligence or recklessness as follows:

(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Id.* at 23. Courts have frequently employed the same definition of "gross negligence" used in assessing punitive damages in civil cases to "recklessness" in criminal cases. The Florida Supreme Court explained the rationale for doing so:

While the kind of negligence required to impose criminal liability has been described in different terms in different jurisdictions, it is uniformly held that it must be of a higher degree than that required to establish simple negligence upon a mere civil issue and the definition above quoted from former decisions of this court as to the character of negligence authorizing punitive damages appears to be in line with the weight of authority as to the character of negligence necessary to be shown to sustain criminal liability. It stands to reason that the degree of negligence to sustain imposition of imprisonment should at least be as high as that required for imposition of punitive damages in a civil action.

*Cannon*, 107 So. at 363 (citing 29 C.J. 1154; 1 BISHOP ON CRIM. LAW (9th ed.) 216, 314.); *see also State v. Riggs*, 2 S.W.3d 867, 871 (Mo. App.1999) ("All of the authorities are agreed that, in order to hold one a criminal, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue") (internal quotations and citation omitted); *Oregon v. McLaughlin*, 42 Or.App. 215, 600 P.2d 474, 477 (1979) ("[W]e do not believe that the legislature intended thereby to permit a lesser quantum of proof to

and the conscious disregard for consequences is crucial. "It is callous disregard of risk, and not awareness *vel non* of risk, however, which is critical."[25] And, of course, determining whether an act or omission involves a substantial and unjustifiable risk "requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight."[26]

■ Whether a defendant's conduct involves "an extreme degree of risk" must be determined by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on every careless act merely because its carelessness results in death or injury to another.[27]

■ In addressing the sufficiency of evidence to prove criminal recklessness, it is not enough to provide the jury with a set of legally correct definitions and then simply turn them loose and accept whatever they decide. Instead, there are "inter-mediate and progressively more demanding burdens of production that must be met by the State, as a matter of law, before the fact-finding process is even ratcheted up from one to the next higher level of possible culpability[.]"[28] The State cannot be permitted to submit its case to the jury unless it has offered a *prima facie* case of a defendant's actual, subjective "disregard of the risk of a resulting [injury] which ... rise[s] to the level of a 'gross deviation' from an ordinary standard of conduct."[29] The incremental risk and *mens rea* that may transform mere civil negligence into criminal negligence and then possibly into criminal recklessness are, although elusive, substantive elements with unique burdens of production that must be satisfied as a matter of law.

Numerous Texas cases have addressed factual scenarios in which the jury could conclude that the defendant consciously disregarded a substantial and unjustified

go to the jury in a criminal case than would be permitted in a civil case involving gross negligence.").

25. Gobert, *supra* note 23 at 461.

26. *Moriel*, 879 S.W.2d at 23; *see also State v. Jones* 151 S.W.3d 494, 499 (Tenn.Crim.App. 2004) (when assessing the legal sufficiency of evidence to prove criminal negligence, "we must view the circumstances 'from the accused person's standpoint' ") (citation omitted); *State v. Owens*, 820 S.W.2d 757, 760–61 (Tenn.Crim.App.1991) (legally insufficient evidence to prove criminal gross negligence; "It is not sufficient to say, with 20/20 hindsight, that the appellant could have, or should have, done some things differently. To affirm this conviction we must view the circumstances under which the appellant acted and find she failed to perceive that her conduct presented an unjustifiable risk to her child. The failure to perceive the risk must be a *gross* deviation from the standard of care than an *ordinary* person would exercise *under the circumstances*.").

27. *People v. Sikes*, 328 Ill. 64, 159 N.E. 293, 297 (Ill.1927); *see also State v. Jones*, 151 S.W.3d at 502 (stating that "ordinary negligence or inattention on the part of a mother does not rise to the level of gross negligence, even if the mother's conduct contributes to the death of her child"); *State v. Riggs*, 2 S.W.3d at 871 (evidence was legally insufficient to support mother's conviction for involuntary manslaughter involving the death of her child; stating that "mere inattention or mistaken judgment resulting even in the death of another is not criminal unless the quality of the act makes it so") (internal quotations and citation omitted).

28. *Pagotto v. State*, 127 Md.App. 271, 732 A.2d 920, 924–25 (1999) (holding that evidence was legally insufficient to support finding of defendant's "gross negligence" in involuntary manslaughter trial; trial court should have granted motion for directed verdict).

29. *Crume v. State*, 658 S.W.2d 607, 609 (Tex. Crim.App.1983).

risk of serious injury to a child. These include holding a child's feet under extremely hot water,[30] ramming a parked car that had an 18–month–old child in it,[31] twisting and pulling a baby's leg,[32] letting a 350–pound lion, which was neither muzzled nor declawed, out of its cage at a flea market populated by children,[33] and speeding and running through stop signs with a child passenger.[34] These cases involved an actor committing a highly dangerous act whose substantial and unjustifiable risks were known to,[35] but disregarded by, the actor, and that act led directly to serious harm to a child. In other reckless injury cases, the defendant failed to perform an act that directly resulted in the injury. In one case the defendant was held to have recklessly caused bodily injury to her children by failing to report to the authorities that her boyfriend had violently kidnaped them.[36] In still other cases the actors have left a disabled victim lying in bleach for at least an hour;[37] neglected a child;[38]

30. *Lee v. State*, 21 S.W.3d 532 (Tex.App.-Tyler 2000, pet. ref'd) ("reckless" to hold child's feet stable under hot, running water for 30 to 45 seconds).

31. *Cleburn v. State*, 138 S.W.3d 542, 545 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd) ("a rational trier of fact could have found appellant to have been aware of, but have consciously disregarded, the substantial risk that using his vehicle, a large pick-up truck, to move George's small Toyota Tercel with a visible car seat and two adult occupants would result in bodily injury to anyone in George's vehicle, including a child").

32. *Torres v. State*, 116 S.W.3d 208, 210 (Tex. App.-Corpus Christi 2003, no pet.) (defendant acted recklessly when he grabbed and twisted infant's leg in anger while changing his diaper).

33. *Durkovitz v. State*, 771 S.W.2d 12, 14–15 (Tex.App.-San Antonio 1989, no pet.) (rejecting claim that evidence was insufficient to prove recklessness and listing eighteen pieces of evidence that supported jury's determination, including "1) that a 350 pound grown lion is a dangerous beast; 2) that appellant is an experienced animal trainer who knew the dangers presented by such a beast; 3) that appellant was aware that the lion had injured two other children before this incident; 4) that appellant knew that such a beast is instinctively attracted to attack smaller creatures, such as children;" etc.).

34. *LaSalle v. State*, 973 S.W.2d 467, 474 (Tex. App.-Beaumont 1998, pet. ref'd) (defendant who drove car at 50 m.p.h. in a 35 m.p.h. zone and ran through numerous stop signs resulting in a collision that injured his child passenger was reckless).

35. *Compare Whitmire v. State*, 913 S.W.2d 738, 740 (Tex.App.-Eastland 1996, pet. dism'd) (evidence legally insufficient to support conviction for reckless injury to a child when evidence did not show that appellant, who admittedly was intoxicated and drove recklessly, knew that there was a child in car that he accidentally ran into).

36. *Patterson v. State*, 46 S.W.3d 294, 303–04 (Tex.App.-Fort Worth 2001, pet. ref'd) (defendant recklessly caused serious bodily injury by failing to call 911 and identify her boyfriend as the violent kidnapper of her children; a "reasonable juror could have found that the ability of law enforcement authorities to immediately respond and restrict access to the city with minimal resources in approximately seven minutes would have enabled them to intercept Woods before reaching the cemetery road and prevented serious bodily injury to the children").

37. *Kennerly v. State*, 40 S.W.3d 718, 721 (Tex. App.-Waco 2001, no pet.) (defendant caretaker at group home for disabled was reckless in leaving mentally and physically disabled woman lying for a minimum of an hour in Clorox that defendant had poured in the hallway; defendant knew Clorox was a hazardous material because she wore gloves when handling it).

38. *Ahearn v. State*, 588 S.W.2d 327, 337 (Tex. Crim.App.1979) (parents recklessly failed to provide adequate food or medical care to their obviously emaciated four-month-old child; "When it became obvious that the child was losing weight and was in such a physical condition and when the wounds became evident, appellants had a duty to seek

failed to immediately seek medical help for a lethargic child;[39] and left four-year-old twins unsupervised and wandering around an apartment complex.[40]

■ Each of these cases involved "conscious risk creation." As noted in the Model Penal Code commentaries, this "resembles acting knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than substantial certainty[.]"[41] A person responsible for such "conscious risk creation" that results in serious bodily injury to a child is "criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient."[42] The defendant's conduct must be a direct cause of the harm suffered although, as set out in section 6.04(a), it need not be the only cause; it may be a concurrent cause.[43]

■ In sum, in addressing the culpable mental state of recklessness under section 6.03(c), the factfinder (and a reviewing court) must examine the defendant's conduct to determine whether

(1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;

(2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others"),[44]

---

medical care. The result of their failure to do so no doubt caused a continuing decline in the baby's condition such that the jury was able to find that appellants acted at least reckless[ly] or with criminal negligence.").

**39.** *Payton v. State,* 106 S.W.3d 326, 330 (Tex. App.Fort Worth 2003, pet. ref'd) (defendant recklessly caused child's injury when he failed to obtain reasonable medical care of his grandson; "Based on the facts that appellant delayed seeking medical treatment for T.P. when the medical evidence showed that T.P. had visible signs of distress, [defendant] had emergency medical training, and [doctor] stated that it was possible that T.P. would have survived if he had received medical care shortly after the injury occurred, the jury could have found that appellant acted recklessly and grossly deviated from the standard of care that an ordinary person would have exercised under all the circumstances as viewed from his standpoint.").

**40.** *Prescott v. State,* 123 S.W.3d 506, 510 (Tex. App.-San Antonio 2003, no pet.) (mother reckless for failing to guard against drowning death of one of her four-year-old twins; "The

testimony of witnesses who, on numerous previous occasions, saw the girls wandering around the apartment complex unsupervised [and returned them to their mother] is legally sufficient evidence of recklessness.").

**41.** American Law Institute, MODEL PENAL CODE § 2.02, Comment 3, at 236.

**42.** TEX. PENAL CODE § 6.04(a) (Causation: Conduct and Results).

**43.** *See generally, Robbins v. State,* 717 S.W.2d 348, 351 (Tex.Crim.App.1986).

**44.** *Moriel,* 879 S.W.2d at 23; *see also Plummer v. State,* 118 Md.App. 244, 702 A.2d 453, 458 (1997) (evidence legally insufficient to support automobile manslaughter conviction; "Only conduct that is of extraordinary or outrageous character will be sufficient to imply" grossly negligent state of mind); *State v. Jones,* 151 S.W.3d 494, 501 (Tenn.Crim.App. 2004) ("Tennessee courts have sustained convictions for criminally negligent homicide only where the 'risk is of such a nature and degree that injury or death is likely and foreseeable.' ") (citation omitted).

(3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and

(4) the defendant consciously disregarded that risk.

With that background of the pertinent law concerning a reckless state of mind, the level of risk required, and causation for the harm suffered, we turn to the present case.

## III.

■ The court of appeals held the evidence legally sufficient to prove that appellant recklessly, by act or omission, caused serious bodily injury to her two children.[45] The court further held that she was criminally responsible because (1) the result would not have occurred but for her conduct, operating either alone or concurrently with Bowden's, and (2) while Bowden's concurrent cause was clearly sufficient to produce the result, appellant's conduct was not clearly insufficient.[46] The court of appeals found, in essence, that a rational trier of fact could conclude that

(1) taking children from a home with utilities to one without utilities, and

(2) leaving them in a bedroom with a lit candle,

(3) creates the foreseeable risk of death or serious bodily injury to those children,

(4) even if another adult caretaker is present.[47]

Furthermore, the court concluded that there was legally sufficient evidence to support a finding that appellant was consciously aware of this risk and that she disregarded it. The court of appeals stated,

> As the girls' mother, Appellant was at least as responsible as Bowden for the decision to take them from Zula Mae's house to the structure, and she, herself, "knew that room," had placed the dresser in front of the window and the chair in front of the locked door. Appellant lit the candle and made sure the girls were in bed in the room with the candle burning before she left for several hours. From the evidence that she always made sure to extinguish the candle, the jury could have inferred that Appellant assumed the role of making sure of extinguishing the candles in that house. This is supported by her statement to Sergeant Harrill that she had no idea what Bowden may have done with the candle after she left. The jury could have inferred that Appellant was aware of but disregarded the risk that Bowden would not know what to do with the candle, specifically that he should extinguish it before leaving the room with the girls asleep. Moreover, Appellant acknowledged that she did not expect the girls to be awake when she returned hours later. Thus, the jury could have further inferred that she was aware of but disregarded the fact that they would fall

---

**45.** *Williams,* 190 S.W.3d at 714.

**46.** *Id.* at 713–14. The court reasoned that the record, viewed in the light most favorable to the verdict, supports the inference that if Appellant had not taken the children to that house and put them to bed with the candle burning that she, herself, had lit, or if she had at least been there to extinguish the candle before the girls went to sleep as

> the evidence indicated she probably would have done, the girls would not have died in the fire. Thus, we cannot conclude that Appellant's conduct was "clearly insufficient," standing alone, to cause serious bodily injury and death to the girls.
> *Id.*

**47.** *Williams,* 190 S.W.3d at 714.

asleep with the candle burning.[48]

Appellant asserts that the court of appeals, in so holding, engaged in "precisely the sort of speculation frowned upon by this Court in *Hooper* [*v. State* ]."[49] She contends that there is legally insufficient evidence that she consciously disregarded a substantial or unjustifiable risk that her girls would suffer grievous harm. She states that she "had left Mr. Bowden to baby-sit while she was out during the evening and had no reason to suspect he was not trustworthy."[50] She also asserts that the evidence of causation was legally insufficient because her conduct, standing alone, was "clearly insufficient" to cause her children serious bodily injury.

> There was absolutely no evidence that the children had ever fallen asleep in any house with a candle left burning in the room. Nor was there any evidence that there had ever been any safety problems or even a hint of injury to the children, especially with candles, in the previous times the children had stayed at the residence. It is also mere speculation by the appellate court that the jury could have inferred that Bowden would not know what to do with the candle or that Appellant assumed the role of making sure of extinguishing the candles in that house. There are no facts to suggest that [appellant] would know Mr. Bowden would move the candle down from a presumably "safe"

place onto the floor behind the bed and leave it burning. These actions, and failures to act, by a person who had at least for the evening assumed an "in loco parentis role, supersede any contributions [appellant] made to the tragedy of that night."[51]

We agree on both counts. First, there is legally insufficient evidence that appellant consciously disregarded a substantial or unjustifiable risk that her children would suffer serious bodily injury in a house fire if she took them from a house with utilities to one without utilities. Viewed objectively, this act, either by itself or in combination with the State's second act of alleged recklessness—leaving the girls in a room with a lit candle—does not involve a "substantial and unjustifiable" risk of serious bodily injury or death. There is nothing inherently dangerous about staying or sleeping in a structure that does not have utilities. Staying in a structure without utilities does not increase the likelihood of dying in a fire. Indeed, as noted by the court of appeals, the evidence shows the opposite:

> As to the lack of utilities, Battalion Chief Holzer testified that the majority of home fires the department responds to are in homes *with* utilities and that a major concern for them is to make sure the utilities are turned off. And the fire investigator agreed that electrical distribution equipment such as wiring, out-

---

48. *Id.* at 713–14.

49. Appellant's Brief at 6; *see Hooper v. State*, 214 S.W.3d 9, 16 (Tex.Crim.App.2007) ("Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.... [A]n inference is a conclusion reached by considering other facts and deducing a logical consequence

from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.") (footnote omitted).

50. Appellant's Brief at 6.

51. *Id.* (citation omitted).

lets, and cords are the second leading cause of fire death and the third leading cause of fires in the United States. Cooking fires are "number one." Only 15 percent of fires in 2001 were attributable to open flames or embers. Fires can occur in homes that have utilities; lack of utilities does not create an immediate chance that there will be a fire. Sammy Beatty did not believe candles were inherently dangerous and believed his girlfriend had some. Zula Mae admitted she had scented candles in her house that she used sometimes even when children were around.[52]

If taking children to spend the night in a structure without utilities is conduct that involves an extreme risk of danger for which one may be subject to criminal prosecution for injury to a child should harm befall that child, the backwoods campers of the world are in serious jeopardy. Any adult who lights a campfire that emits a spark that lands on a child's pajamas and severely burns the child can be prosecuted as a felon. Scoutmasters beware. If a Coleman gas lantern tips over and sets the children's pup tent ablaze, they might suffer the same fate. The parent who uses a candle to read a bedtime story to the weary little camper may rue the reading hour if the candle tips over and burns the child. Any of these harms *might* befall a camper's child, but the act of camping in a site without utilities does not create such a foreseeable substantial and unjustifiable risk of serious bodily injury or death that it suffices to hold the camper's parent criminally liable should injury occur. Yet this act is precisely the same as that alleged by the State in this case: taking a child from a house with working utilities to one without them.

One could also pose the legal issue in the opposite manner: Would appellant have been free from criminal liability had she done everything that she did do, but Bowden's duplex had working utilities? After all, people who have electricity frequently use candles as well as, or instead of, electric lights on various occasions. Zula Mae used candles even though her house had light bulbs. But the law does not predicate a finding of criminal liability for creating an unjustifiable and substantial risk of injury upon whether the actor used a candle out of necessity (an act that purportedly creates a substantial and unjustifiable risk) or for aesthetic purposes (a purportedly blameless act).

The State argues that appellant's act of taking the children from Zula Mae's house to Bowden's was a reckless one because appellant ignored her mother's sage advice: "[I]t was too dangerous to be taking them down there and burning candles." Alas, who among us has not been guilty, from time to time, of ignoring our mother's wise words. In hindsight, of course, Zula Mae proved to be a prescient Cassandra; the very harm that she had predicted did, in fact, occur. But merely because appellant failed to heed her mother's words does not mean that the act of taking the children to Bowden's house (or camping outdoors for that matter) created a substantial and unjustified risk of serious bodily injury to the girls. Appellant's "stupidity, irresponsibility, thoughtlessness, [or] ordinary negligence" do not constitute reckless disregard of a substantial and unjustified risk. A number of judicial decisions involving criminal "gross negligence" or "recklessness" have held that warnings like that given to appellant by Zula Mae do not suffice to establish the existence of a severe risk of injury or the defendant's

---

52. *Williams,* 190 S.W.3d at 716.

conscious disregard of such a risk.[53] The importance of such warnings must be

53. *State v. Jones*, 151 S.W.3d 494, 497–501 (Tenn.2004) (finding legally insufficient evidence to support mother's conviction for criminally negligent homicide of her two-year-old child who died when passenger-side air bag deployed and broke child's neck after collision even though the State showed (1) the mother had been verbally warned about child restraint law by hospital administrator and was given a written pamphlet on car seat safety that stated, "never hold a child in your lap while riding in either the front or back seat" and "be consistent! Always buckle your child in the safety seat," (2) the rental car visor and seat belt contained explicit warnings that "Children 12 and under can be killed by the air bag" and "ALWAYS use SEAT BELTS and CHILD RESTRAINTS," and (3) "during the year prior to the accident, assorted public service announcements in print and television were circulated regarding the importance of using child restraint seats"; although the defendant's "failure to heed these warnings and to perceive the danger posed by sitting with her child on her lap in front of an air bag may have been negligent, our cases illustrate that it simply does not rise to the level of gross negligence necessary to uphold a conviction for criminally negligent homicide") (citation omitted); *State v. Riggs*, 2 S.W.3d 867, 868, 872, 875 (Mo.Ct.App. 1999) (evidence legally insufficient to support defendant's conviction for involuntary manslaughter for the drowning death of her two-year-old son; although landlord had warned defendant not to let her children go beyond the last mobile home in the park because "there was an open basement and an unfenced duck pond located about 80 feet from that last trailer," defendant's conduct of being "inert, inactive, and languishing in front of a movie" for 45 minutes while her children played outside "did not manifest a conscious disregard of a risk of death to her child." The court noted that defendant's "conduct included nothing intentional. She did not commit overt acts that would blatantly harm a child. Her omission to watch her children on the steps of her home for a forty-five minute period did not make it substantially certain that her two-year-old son would wander to his death. The pond was 628 feet away from her home with more than 8 homes between [defendant's] home and the pond."); *State v. Owens*, 820 S.W.2d 757, 760–61 (Tenn.Crim.App.1991) (finding legally insuffi-

cient evidence to support mother's conviction for criminally negligent homicide of her eleven-month-old daughter who died of bronchitis and pneumonia; (1) defendant's primary care physician had warned her that taking her disabled daughter into public places would expose her to a great risk of infection and the mother regularly took daughter out with her, and (2) the State "presented several other witnesses who related incidents in which the care the appellant gave to [her daughter] did not conform to the instructions given by the doctors[,]" but these acts amounted to no more than "some carelessness and negligence," and did not rise to the level of gross negligence which requires proof of a gross deviation from the required standard of care); *State v. McLaughlin*, 42 Or.App. 215, 600 P.2d 474, 475–77 (1979) (finding evidence legally insufficient to support defendant's conviction for child neglect in the death of her newborn baby who died when her husband hit the baby while babysitting him even though (1) father had a well-known violent temper and a history of assaulting their children and was, at the time of the baby's death, awaiting trial for assaulting their six-year-old daughter while babysitting her, and (2) State offered evidence that caseworker for Children's Services Division had warned the mother that a " 'high risk situation' could exist if the daughters were around the husband and also after a new baby would come into the home"). In *McLaughlin*, the court stated that the case never should have been submitted to the jury on the issue of criminal negligence:

The statutes describing the offense and the definition of the standard of care together required that before this charge could have been submitted to the jury there had to be evidence from which it could fairly have been found: (1) that the act of the mother in leaving the child in the care of his father while doing an ordinary family chore was done without recognition of a high degree of likelihood that he would cause an injury to the child; and (2) that the failure to recognize that likelihood was different in an extraordinary way from what others would have done in similar circumstances. Even given the husband's record of bad temper and violence toward her and one of the older children, and the warnings of the caseworker, the evidence was not sufficient to permit a finding that the mother failed to recognize the degree of risk to the extent

viewed in light of the likelihood of their occurrence and magnitude of the danger posed at the time the defendant acted, not in post-event hindsight.

Because we cannot conclude that the act of taking a child from a house with working utilities to one without working utilities is the type of conduct that, by its nature, raises a substantial and unjustifiable risk of injury, we hold that it cannot support a finding of reckless injury to a child.[54] Thus, even if the State proved beyond all possible doubt that appellant did take her children from a house with working utilities to one without, that fact cannot, either by itself or in combination with other acts, support a finding of criminal recklessness under these circumstances.[55]

Therefore, we must consider whether appellant's act of leaving her two girls in a room with a lit candle under Bowden's supervision could support a finding that she was criminally reckless in causing her children's death.[56] This is an act that, by its nature and depending upon the circumstances, could support a finding of recklessness—the conscious disregard of a substantial and unjustifiable risk of injury. Were there such circumstances shown in this case? The court of appeals correctly stated, "It was undisputed that Appellant did not leave the girls alone to sleep in the room with the candle burning but left them awake with Bowden in the room to care for them, and there was evidence that he was trustworthy to care for the children."[57] In fact, there was absolutely no evidence that Bowden was an incompetent or uncaring babysitter. All of the evidence indicated that, in fact, he was a considerably more responsible caretaker than appellant herself.[58] It is, as appellant

---

that any reasonable person would have done.
600 P.2d at 477.

54. According to USAID, two billion people worldwide lack access to affordable and reliable energy supplies. *See Testimony of the Alliance to Save Energy Submitted to the House Appropriations Subcommittee on Foreign Operations 2007 Appropriations for USAID's Energy Programs, March 31, 2006* (available at *http://www.ase.org/content/article/detail/3046*) (last visited September 20, 2007). The world's population is currently 6.6 to 6.7 billion. *See* http://www.census.gov/ipc/www/popclockword.html (last visited September 20, 2007). Thus, nearly one in three people in the world go to sleep as did Ujeana and Precious Williams—by candle light, gas light, fire light, or no light at all.

55. One can, of course, imagine some circumstances in which this act could give rise to a finding of a substantial and unjustifiable risk. Suppose, for example, that we are back in the early 1950's and appellant's child had polio requiring her to be in an iron lung. The iron lung is powered by electricity, which is used to continuously assist her to breathe. Detaching the child from her source of electricity and taking her to a structure without electric-

ity, while actually aware that it is the iron lung that sustains her child's life, would constitute a substantial and unjustifiable risk of injury.

56. The court of appeals noted that
it was undisputed that Appellant did not leave the girls in the room alone to sleep with the candle burning, but that Bowden had agreed to and did stay with the girls. Bowden was in the room with Appellant when she lit the candle before she left the second time, and Bowden was in the back room with the girls when Appellant left.
190 S.W.3d at 714–15.

57. *Williams*, 190 S.W.3d at 716.

58. As the court of appeals stated,
There was evidence that Appellant could have trusted Bowden to take care in keeping the girls that night. Bowden and Appellant had been seeing each other for about four years. Charles Williams and Sammy Beatty both testified that Bowden seemed to be a friend to the girls and Beatty recalled that he sometimes heard them call him "Dad." Beatty had known Bowden for many years, since they were kids. Beatty owned two houses on Dallas Street, including the one next door to the structure

asserts, "mere speculation by the appellate court that the jury could have inferred that Bowden would not know what to do with the candle or that Appellant assumed the role of making sure of extinguishing the candles in that house."[59] There is nothing in the record to support this supposition that Bowden did not know what to do with a lit candle. Blowing out a candle is not rocket science. And there is nothing in the record to suggest that Bowden could not handle the task or did not care enough to handle it. Quite the reverse. In hindsight, Bowden expressed great remorse and regret that he did not blow out the candle when he went back in to check on the sleeping girls. He had left it burning so that the girls would not be in the dark. In hindsight, this was obviously an unwise decision; even at the time this was, perhaps, an unwise decision, but it does not prove he was an incompetent caretaker or that appellant was actually aware that he was an incompetent caretaker. A parade of State's witnesses had nothing bad to say about Bowden and much that showed his conscientious character.[60] There is simply no evidence to suggest

---

Bowden was staying at. Beatty was remodeling it and Bowden was helping him. Bowden also had started working at Bennigan's with Beatty, so they worked together almost every day. Beatty recalled that Bowden would get food for the girls at Bennigan's almost every day.

*Id.* at 715. The court of appeals also stated, In his second statement, Bowden elaborated that the girls were just like his own children to him. He spent his money on them, and his time with them. Zula Mae had complained to him how much he babysat the girls when Appellant would go places. The girls were always a number one priority for him. There was no evidence that Bowden used drugs or alcohol that night. The jury could reasonably have concluded that Appellant did not act recklessly in leaving the girls in Bowden's care with the candle still burning.

*Id.* (footnote omitted).

59. Appellant's Brief at 6.

60. *See Williams,* 190 S.W.3d at 714–15. For example, appellant's mother, Zula Mae Scott, agreed that the children liked to spend time with Mr. Bowden:

Q Okay. Is it a fact that Mr. Bowden spent a lot of time with the children over the years?
A Yes. When they was with their mother and him.
* * * *
Q Okay. Do you have any facts which would support a conclusion that he set out to hurt the children?
A No, I don't.
* * * *
Q Okay. And I understand this is hard to gauge, but did the children seem to enjoy going over to visit [Mr. Bowden] with their mother?
A Yeah, they was happy to be with their mother.
Q At Ronald's residence?
A I—at anywhere their mother was at, they would like to be with her.

Charles Leon Williams, Jr., the father of the two girls, testified he had no issue with Mr. Bowden—

Q And—and did you know Ron was hanging around last fall with Sharan?
A Yes, ma'am.
Q Did you—did you know Ron?
A Yes, ma'am.
Q And about how long have you known Ron?
A I've known him for some years.
* * * *
Q Was there any animosity between you and Ron?
A No, ma'am. We worked together a couple of times.
Q Okay. You didn't have a problem with the fact that your ex was—was dating someone else?
A No, ma'am.
* * * *
Q Okay.... Mr. Williams, would you have gone and gotten the girls that night had you known they were not at home?
A Yeah. She would told me to go get them somewhere. I would have picked them up.
Q You had a vehicle you were driving?
A Yes, ma'am.
* * * *
Q And you wouldn't have had any problems with Ron as far as any animosity or ex-spouse kind of thing going on there?
A No, ma'am.

that Bowden, the "Johnny–on–the–Spot" babysitter, was in any way incompetent. But the oddity of this case—the fact that

Q You could have gotten the girls and take them back to your place?
A Yes, ma'am.
* * * *
Q ... Last series of questions, you had worked with Ron, there wasn't any—worked with Ron, there wasn't any problems. Fundamentally did you think of him as a good guy?
A I knew him as a friend.
Q As a friend. You don't have any doubt in your mind that Ron—Ron set out to hurt your children, do you? You don't think he wanted to hurt Precious or Ujeana?
A No. Ain't nobody want to hurt them.
Q Okay. Do you think of it as an accident?
A Fire started accidentally.

In addition, appellant's neighbor Lee Sammy Beatty, testified favorably about Mr. Bowden. Mr. Bowden often worked for Mr. Beatty, at Bennigan's, and also on a remodeling job. He'd known Mr. Bowden since he "was a kid."

Q ... You have no reason to believe or no fact that you can provide to the jury that would sustain a belief that he wanted to hurt the kids—
A No.
Q—is that correct?
A No.
Q And indeed, you believe quite the opposite—
A Right.
Q—is that correct?
A Yeah, those kids were fine.
Q Those kids were fine. Did—to the best of your recollection, did [Ron] used to sometimes get food at Bennigan's to give to the children?
A Just about every day. But—
Q Go ahead.
A I—I'd get on him. Hey, you're not supposed to do this. But they're for the kids, so—
Q Considering the circumstances?
A You know, I didn't have no problem with it. I did, but didn't at the same time.
Q Right. You don't think he intentionally wanted to hurt the children, do you?
A No way.
Mr. Beatty also noted that he did not think a residence became inherently unsafe once utilities were shut off:

appellant left the children in the care of Bowden, who was not shown to be an unsuitable caregiver—makes it one of a kind.[61] That difference takes this case out

Q ... You alluded to in your childhood there were times when you essentially had to do without?
A Yes. Stuff didn't get paid, stuff got cut off.
* * *
Q So there might be a period there, a few days, even a few weeks, where you're without electricity or without gas?
A Yeah. It can happen to anybody.
Q Exactly? It can happen to anybody. Would you have considered your house to be inherently unsafe because you didn't have gas or electricity during that time?
A No. No. Still home to me.
Q In this particular house where Ron was living at back there, you wouldn't have been interested in adding on to your house unless you felt it was a well-built, solid structure?
A Right.
Q Would you have had any problem staying there yourself—
A No.
Q—in that house?
A No.
These were all State's witnesses. The State put on no "bad character" witnesses.

61. There was no evidence Bowden was drunk, "high," or otherwise incapacitated. *Contra Bohannon v. State*, 230 Ga.App. 829, 498 S.E.2d 316, 320–23 (1998) (sufficient evidence to support manslaughter conviction when defendant, while in a drunken state, took her infant "from the safety of a babysitter," and placed the baby in bed with her and the baby's father, who she knew was also intoxicated, and, in a drunken sleep, rolled on top of their child and asphyxiated her). And there was no evidence that appellant had any reason to suspect that Bowden was an unfit caretaker. *See e.g., Rayzor v. United States*, No. 96–2100, 121 F.3d 695 (1st Cir. July 22, 1997) (not designated for publication) (affirming the grant of Navy's motion for summary judgment against parents who sued on behalf of their daughter, who was allegedly abused by a babysitter whom the parents hired from a list of sitters recommended by the Navy; no evidence "that the Navy lacked due diligence in failing to investigate the individuals whose names appeared on the list. They cite to no

of the norm of reported fatal neglect cases.[62] On this record, we cannot agree that appellant's leaving her children with Bowden in a room with a lit candle represents a gross deviation from the standard of conduct that a law-abiding person in appellant's situation would observe. The Texas Supreme Court has enunciated an appropriate standard for civil cases involving reckless conduct which, applied here, asks: "viewed objectively" from appellant's viewpoint, did her act or omission "involve an extreme degree of risk, considering the probability and magnitude of the potential harm" to her two daughters?[63] The acts that the State alleged and proved do not meet that threshold. This factual situation—leaving Ujeana and Precious, 7–and 8–year–old girls, in bed with a lit candle upright in a metal pan with Bowden near-by watching over the girls—is not one so inherently fraught with danger as to create, in the mind of the objectively reasonable person, the awareness of a substantial and unjustifiable risk of serious bodily injury. If appellant's conduct would not suffice to raise a jury issue for imposition of punitive damages in a civil case, it is hardly sufficient to raise a jury issue for a criminal conviction.

■■■■ For related reasons, we also agree that appellant is not "criminally responsible" for the result in this case. Texas Penal Code § 6.04(a) provides, "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor

---

incidents of child abuse involving Red Cross sitters generally, or concerning the specific individuals on the list at the base").

**62.** *See generally* Jennifer M. Collins: *Crime and Parenthood: the Uneasy Case for Prosecuting Negligent Parents*, 100 Nw. U.L.Rev. 807 (2006). Professor Collins identified general trends in part by studying reported judicial decisions involving fatal parental negligence. She found only ninety-two such decisions nationwide and categorized them as: (1) failure to provide (such as food, water, or medical care), (2) failure to supervise, and (3) failure to intervene (to protect a child from the abuse or neglect of another adult). *Id.* at 818. She noted,

> The reported case survey showed, as I expected, that a very significant percentage of the cases involved a failure to provide for a child, especially medical care. Forty-three cases primarily involved a failure to provide for the child. In twenty-four of those forty-three cases, the charges against the parent primarily involved a failure to provide timely medical care. Twelve of the remaining cases involved a failure to provide nourishment and six involved a failure to provide both. Another case, in which a four-day-old baby was attacked and killed by a

swarm of fire ants, involved a failure to provide safe conditions. Only thirteen of the ninety-two cases included an allegation that the death was caused by a failure to intervene to protect a child from abuse by another individual, probably because this is still a relatively new legal development.

> In thirty-four of the ninety-two cases, the parent or guardian was prosecuted because of a failure to provide adequate supervision. Thus, prosecution in failure to supervise cases is certainly not unprecedented. The most common causes of death were as follows: twelve cases involved accidental drowning, which resulted either from children being left unattended in a bathtub or from children being left unsupervised, allowing the children to wander outside and drown in a pool or other water hazard; eleven cases involved leaving young children home alone, who died when a fire broke out in their residence; and seven of the remaining cases involved deaths in automobiles.

*Id.* at 818–19 (footnotes omitted).

**63.** *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 22 (Tex.1994) (holding that evidence of defendant's allegedly "reckless" conduct was legally insufficient to support award of punitive damages in civil lawsuit).

clearly insufficient."[64] The court of appeals held that

> if Appellant had not taken the children to that house and put them to bed with the candle burning that she, herself, had lit, or if she had at least been there to extinguish the candle before the girls went to sleep as the evidence indicated she probably would have done, the girls would not have died in the fire. Thus, we cannot conclude that Appellant's conduct was "clearly insufficient," standing alone, to cause serious bodily injury and death to the girls.[65]

Under such a lengthy "but-for" chain of causation, however, one could trace that chain of causation much further back in time, in fact, all of the way back to appellant's conduct of meeting Charles Leon Williams, Jr., having an intimate relationship with him, bearing the two girls, breaking up with Mr. Williams, and so forth. "But for" those acts, Ujeana and Precious never would have been in Bowden's home or under his care on October 5, 2002. Obviously, some element of foreseeability limits criminal causation just as it limits principles of civil "proximate causation."[66] Criminal liability is predicated on "but-for" causation, and appellant's acts are not a "but-for" cause of her girls' death unless that result is within the scope of the risk of which she was aware.[67] Such would

---

64. TEX. PENAL CODE § 6.04(a).

65. 190 S.W.3d at 713–714.

66. *See* American Law Institute, MODEL PENAL CODE § 2.03, Explanatory Note at 254–55 (stating that but-for causation is not sufficient by itself, and stating, "Liability is predicated on but-for causation, subject to limitations based on the relationship between the risks created by the actor's conduct that support a finding of recklessness or negligence and the consequences that in fact ensued"), *see also id.* at 263–64 (discussing offenses in which recklessness or negligence is the required culpability and in which the actual result is not within the risk of which the actor was aware or, in the case of negligence, of which he should have been aware), *id.* at 265 n. 24 (discussing a federal draft provision on criminal causation that left limitations on "but-for" causation "to judicial development of the concept of proximate cause"; stating that Texas had enacted a variation of the federal draft which, "[t]aken literally ... would imply that but-for causation alone is ordinarily sufficient for liability, subject only to qualification with respect to concurrent causes," and noting that "[t]he same error occurs in the Alabama Code").

67. *See, e.g., People v. Warner–Lambert Co.,* 51 N.Y.2d 295, 434 N.Y.S.2d 159, 414 N.E.2d 660 (N.Y.Sup.1980). In *Warner–Lambert,* four corporate officials were indicted for second-degree manslaughter and negligent homicide. The defendants operated a chewing-gum factory and had been warned that dust build-up created a hazard of explosion. Sometime after the warning, but before the defendants had taken significant steps to remedy the situation, a spark ignited an explosion that killed six employees. The court of appeals dismissed the indictments before trial because the facts, as alleged, were insufficient to prove that the defendants' conduct caused the deaths. Although [the defendants] were aware that there was a broad, undifferentiated risk of an explosion in consequence of ambient magnesium stearate dust arising from the procedures employed in its manufacturing operations, the corporate and individual defendants may nonetheless not be held criminally liable, on the theory of either reckless or negligent conduct, for the deaths of employees occasioned when such an explosion occurred where the triggering cause thereof was neither foreseen nor foreseeable.

414 N.E.2d at 661.
 Analogized to the present case, it is not sufficient to prove that leaving a lit candle in a bedroom could cause a fire that causes the death of children. It is the general chain of events that did actually occur which must have been at least reasonably foreseeable. *See id.,* 414 N.E.2d at 666 (distinguishing scenario in which the defendant had abandoned the victim on a roadway and the foreseeable chain of events that led to that victim's death; "We subscribe to the requirement that the defendants' actions must be a *sufficiently direct cause* of the ensuing death before there can be any imposition of

be the case if the intervening cause was reasonably foreseeable on her part. But it was not. Bowden's act of falling asleep without blowing out the candle was not reasonably foreseeable to appellant at the time she left. It was not reasonably foreseeable that Bowden would move the candle. Nor was it foreseeable that a sheet or clothing would then fall on the burning candle, or that Bowden would not be able to get the children out of the house after a fire started. For the same reason that leaving the children with Bowden did not represent a gross deviation from the standard of conduct that a law-abiding person in the appellant's situation would observe, appellant's acts are not a "but-for" cause of the result in this case: there is nothing to suggest that Bowden was an incompetent caretaker or that appellant, had she been there, would have prevented this tragedy.

█ The State argues that the "substantial, unjustifiable risk" was "foreseeable" because of Zula Mae's warning. But failing to follow a prophetic warning does not suffice to establish a foreseeably severe risk of harm. Mothers warn against improbable and unlikely dangers as well as objectively obvious ones. The Texas Supreme Court has explained, in the analogous context, "Extreme risk is a function of both the magnitude and the probability of the anticipated injury[,] . . . the 'extreme risk' prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather 'the likelihood of serious injury[.]'"[68] Further, the severity of the risk must be measured

from the defendant's viewpoint at the time of the act or omission. As the supreme court explained in *Moriel,*

> Determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. In every negligence or gross negligence case, some injury has allegedly occurred. However, the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior. For example, inadvertently dropping a wooden board into the metal hold of a ship may constitute negligence, but cannot be *gross* negligence. This is so even though the board, upon landing, triggers a Rube Goldberg chain reaction, eventually causing the whole ship to explode.[69]

█ Thus, even though appellant's act of leaving the girls with a lit candle in the room under the care of Bowden may have, in a "Rube Goldberg" chain of events, ultimately led to their demise, "it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger."[70] Here, as in *Moriel,* the task in evaluating legal sufficiency of the evidence to support a finding of "gross negligence" for civil lawsuit purposes (or "recklessness" for criminal liability) is to "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people

criminal liability, and recognize, of course, that this standard is greater than that required to serve as a basis for tort liability. Thus, [in the prior case] we were concerned for the nature of the chain of particularized events which in fact led to the victim's death; it was not enough that death had occurred as the result of the defendants'

abandonment of their helpless victim.") (internal quotations omitted; citation omitted).

68. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994).

69. *Id.* (footnote omitted).

70. *Id.*

to differ in their conclusions."[71] Appellant cannot be liable for a reckless injury to her children unless she was actually aware, at the time she left, of a genuine and unjustifiable likelihood of serious harm to her children from leaving a lit candle in the bedroom while her children were under Bowden's care.[72] Here, as in *Moriel*, the evidence does not support (1) the inference that appellant had any subjective awareness that her children would probably suffer serious bodily injury because of the lit candle in the bedroom while under Bowden's care, or (2) the inference that appellant's action of leaving the children under Bowden's care with the lit candle in the bedroom created a risk of serious harm to those children.[73] Appellant's mother's warning was too general and unfocused to suffice to raise a jury issue on either of these prongs.[74] Here, as in *Jones, Riggs, Owens, and McLaughlin*,[75] the warnings given were too general and unfocused to establish that (1) the mother was subjectively aware of the risk of a deadly accident, and (2) her actions created a severe risk that such an accident would occur.

The State also argues that appellant is criminally responsible for this accident because she "had the ultimate authority to make decisions on behalf of her children," and she had alternatives: appellant could have left the children with either her mother Zula Mae, or the girls' father, Charles Williams, Jr. Then they would have "had the usual amenities of a functioning home."[76] This underscores what appellant maintains: "under the State's theory, presumably appellant would have no culpability [and hence no criminal liability] for the girls' deaths if they had perished in a fire from a lit candle in … [a] building with working utilities."[77] Almost one third of the world lives, day in and day out, without electricity.[78] Are all of those parents who live without electricity but who could send their children off to someone else—another relative, a friend, nurses at an orphanage—who does have electricity criminally liable when they do not do so and an accidental fire causes their children's death? Viewed in a different light, what makes this scenario distinguishable from a family's camping venture in which the cabin is lit only by firelight or candles and one parent leaves to go fishing while the other supervises the sleeping children? Is the departing parent criminally reckless in leaving the other parent with the children in a cabin with a roaring fire or a flickering candle?

There appear to be no reported cases in Texas (or any other state) of criminal prosecutions in this scenario. We can find no case in which a parent was held criminally liable for recklessly causing injuries to his child while that child was under the care of an apparently competent babysitter.[79]

---

71. *Id.* at 25.

72. *Id.*

73. *Id.*

74. *See, e.g., General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 596–97 (Tex.1999) (car manufacturer's consumer warning concerning possibility that car "not fully in Park" could "move suddenly" and be dangerous did not allow an inference that G.M. consciously decided to downplay the "mis-shift danger" or "provide a reasonable basis upon which to infer conscious indifference"; legally insuffi-

cient evidence to support a finding of gross negligence for purposes of punitive damages).

75. *See* note 53 *supra*.

76. State's Brief at 8–9, 15.

77. *Williams*, 190 S.W.3d at 710.

78. *See supra* note 54.

79. In civil law, a babysitter owes a child due or reasonable care. *See* RESTATEMENT (SECOND) OF TORTS, § 324 (Duty of One Who Takes Charge of Another Who Is Helpless).

Nor can we find any case in which the mere fact that either a parent or a babysitter cares for children in an abode without electricity is, by virtue of that lack of

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

*Id.; see also id.,* Comment B ("It applies also to one who takes charge of another who by reason of his youth is incapable of caring for himself"); *Standifer v. Pate,* 291 Ala. 434, 282 So.2d 261, 265 (1973) ("defendant under-took to supervise, watch and care for plaintiff. By undertaking to perform these services, defendant binds himself to the exercise of due care in their execution, irrespective of compensation"); *Zalak v. Carroll,* 15 N.Y.2d 753, 257 N.Y.S.2d 177, 205 N.E.2d 313, 313 (1965) ("Even without compensation, when defendants undertook to control a young child and provide care for her, they became responsible for her injury through their negligence.") (citations omitted); *Whitney v. Southern Farm Bureau Casualty Ins. Co.,* 225 So.2d 30, 33 (La.Ct.App.1969) ("As a general rule, a person who undertakes the control and supervision of a child, even without compensation, has the duty to use reasonable care to protect the child from injury. Such person is not an insurer of the safety of the child. He is required only to use reasonable care commensurate with the reasonably foreseeable risks of harm").

In one case, a mother was held to have breached her duty of exercising reasonable care when she left the child with a babysitter. In *Chicago & N.W. Ry. Co. v. Schumilowsky,* 8 Ill.App. 613 (1881), the court found a mother, who had left her child with a sitter while she went to the store, was at least culpably "negligent." The child, apparently under the care of his uncle, strayed out of the house and was sitting by the side of a railroad track when a train struck and killed him. *Id.* at 613. The mother sued the railway company for the child's death, but did not recover: "The proof shows, either that the mother left the child in the care of its uncle, or if not in his care, then

modern utilities, criminally reckless when an accident causes a fatal fire.[80]

As the court of appeals noted in this case, criminal prosecutions for tragic accidents are inherently troubling.[81] They are

in the care of no one, and it is immaterial which. If left in the uncle's care he gave it no attention, and permitted it to go at large; and this, under the circumstances, was culpable negligence. If the mother went away leaving the child in the care of no one, it was equal negligence on her part." *Id.* at 619. Here, the mother was held civilly negligent, not criminally reckless, in contributing to her son's death.

80. *See People v. Rodriguez,* 186 Cal.App.2d 433, 438, 8 Cal.Rptr. 863 (Cal.App.1960) (evidence legally insufficient to support the defendant's conviction for manslaughter when she left her four small children alone at home for several hours, and an accidental fire of unknown origins burned her house down and caused the death of one of her children).

81. *Williams,* 190 S.W.3d at 717 ("This is a troubling and tragic case. Poverty and having to 'do without' is not a crime, but Appellant had choices she chose to disregard."). One commentator has noted a "particularly important—and disturbing," trend in one empirical study: that "parents in blue collar professions and parents who were unemployed were four times more likely to be prosecuted than parents from wealthier socioeconomic groups" for fatal accidents involving children. *See* Collins, 100 Nw. U.L.Rev. at 809. Professor Collins set out the results of an empirical study examining prosecutorial charging decisions over a six-year period in cases involving children who died of hyperthermia when left alone in motor vehicles and noted:

> One of the most striking trends in the data was the preferential treatment accorded parents who could be identified via descriptions contained in media reports as middle or upper class or employed in "white collar" professions. I was able to obtain information regarding both socioeconomic status and prosecution outcome for fifty-one of the cases involving parents as potential defendants. Thirty of these cases involved parents who could be characterized as working in a white collar profession or as

also rare.[82]

■ Although we agree that "the decision to file criminal charge[s] is justifiable in cases involving gross negligence because of its deterrent and expressive effects[,]"[83] the specific acts alleged and proven by the State in this case do not support a finding of such gross negligence amounting to recklessness on appellant's part. In the vast majority of cases, the issue of whether the evidence supports a finding of culpable recklessness is a question for the jury. But on occasion it becomes a question of law.[84] If the acts themselves do not pose a

being the spouse of a white collar professional. Professions ranged from a NASA scientist to college professors to a hospital CEO. Of these individuals, only seven were prosecuted, for a prosecution rate of 23.3%. But of the twenty-one individuals who could be classified as working in a blue collar profession or who were unemployed, or had some other indicator of a lower socioeconomic status such as living in a mobile home with no working utilities, eighteen were prosecuted, translating to a staggering prosecution rate of 85.7%. *Id.* at 831–32 (footnotes omitted). By comparison, when San Antonio's Senator Frank Madla, his wife's mother, and his grandchild died in a house fire caused by candles lit in celebration of Thanksgiving, no one was prosecuted. Lomi Kriel, *Madla, Grandchild Reunited in Death*, San Antonio Express–News, Nov. 26, 2006, at 1B. ("Dozens of candles had been lit in the living room and in the backyard during the Madlas' Thanksgiving celebration and, although they had been blown out, they had likely caused the fire[.]"). Instead, Texas legislators responded by drafting the "Senator Frank Madla Act" requiring smoke detectors in homes. Gary Scharrer, *Senate OKs Madla Act Unanimously*, San Antonio Express–News, Apr. 27, 2007, at 11A.

82. Published opinions dealing with prosecutions for accidental fires are few and far between. In *People v. Albers*, 258 Mich.App. 578, 672 N.W.2d 336 (2003), a conviction of involuntary manslaughter based on a fire started by the defendant's six-year-old child was upheld. The child had found a cigarette lighter underneath a sofa cushion, jumped onto a kitchen counter and grabbed a candle from the top of the refrigerator, then took the candle and lighter to the defendant's bedroom and lit the candle. *Id.* at 338. Shortly thereafter, "the bedroom curtains caught fire, and the fire eventually spread throughout the apartment complex," killing a neighbor's baby. *Id.* The court held the evidence sufficient because the prosecution proved that: 1) the child was a known fire starter, 2) the

defendant was aware of that fact and had been repeatedly warned to keep all flammable materials and incendiary devices (including cigarette lighters) out of the child's reach, and 3) that the defendant had refused to do so, stating that she was " 'not going to live like that,' and '[her children] know better than to play with matches or lighters.' " *Id.* at 339.

83. Collins, 100 Nw U.L.Rev. at 811.

84. *See Jones*, 151 S.W.3d at 503 (evidence legally insufficient to support mother's conviction for criminally negligent homicide because her conduct did not constitute a gross deviation from the standard of care); *Riggs*, 2 S.W.3d at 875 (evidence legally insufficient to support mother's conviction for involuntary manslaughter because facts and circumstances were not sufficient to establish gross negligence or show a conscious disregard for human life); *Owens*, 820 S.W.2d at 760–61 (evidence legally insufficient to support mother's conviction for criminally negligent homicide because her carelessness and negligence did not rise to the level of gross negligence); *McLaughlin*, 600 P.2d at 477 (evidence legally insufficient to support mother's conviction for child neglect because the "evidence was not sufficient to permit a finding that the mother failed to recognize the degree of risk that any reasonable person would have done"); *see also People v. Angelo*, 246 N.Y. 451, 159 N.E. 394, 396 (1927) ("Under a given state of facts, whether negligence is culpable is a question of judgment. Ordinarily for the judgment of the jury, as is the question whether negligence exists at all. But in the one case as in the other it may become a question of law. If the negligence is so slight as not to reach the required standard the court should advise an acquittal of the accused."); *People v. Rodriguez*, 186 Cal.App.2d 433, 8 Cal.Rptr. 863, 869 (1960) (evidence legally insufficient to support manslaughter conviction when "[t]here was no evidence from which it can be inferred that defendant realized her conduct

"substantial or unjustifiable risk" that the harm will occur, or if that "extreme degree of risk" was not actually foreseen by the defendant, or if the defendant's conduct was clearly not sufficient, by itself, to result in the injury but the conduct of another was clearly sufficient, then the evidence is not legally sufficient to submit the case to a jury or to sustain a conviction. We do not sit as a "thirteenth juror" and disagree with the jury's finding that the appellant did the very acts that the State alleged she committed. The jury followed the law as it was given to them. But the State's allegations of the purportedly reckless acts committed by appellant are simply not acts that, viewed objectively under these particular circumstances, involved "an extreme degree of risk, considering the probability and magnitude of the potential harm to others."[85] Appellant may have been a "bad" mother, unworthy of her mother, her children, and her boyfriend, but she did not commit the crime of reckless injury to a child merely because she took her children from a house with utilities to one without utilities, and left them, under the care of a responsible adult, with a lit candle in the bedroom.

In this case, the evidence of a criminally reckless *mens rea* and causation were legally insufficient to sustain appellant's conviction. We thus reverse the court of appeals and order an acquittal.

KELLER, P.J., filed a dissenting opinion in which MEYERS, J., joined.

KELLER, P.J., filed a dissenting opinion in which MEYERS, J., joined.

This case is not about a family camping trip gone wrong. It's not about a poor family doing the best it could with the little they had. This case is about two little girls who died a horrible death because their mother, for no good reason, took them from a safe home and left them in a place that she knew was a fire hazard. She left them there with a lit candle, telling them she was going to the store to get them snacks and that she would be back, but she didn't come back. The jury had no trouble deciding that appellant's behavior on the night of October 4, 2002, was

would in all probability produce death. There was no evidence as to the cause of the fire, as to how or where it started. There was no evidence connecting defendant in any way with the fire. There was no evidence that defendant could reasonably have foreseen there was a probability that fire would ignite in the house and that Carlos would be burned to death. The most that can be said is that defendant may have been negligent; but mere negligence is not sufficient to authorize a conviction of involuntary manslaughter."); *Pagotto v. State*, 127 Md.App. 271, 732 A.2d 920, 925, 969 (Md.Ct.Spec.App.1999) ("In a case charging involuntary manslaughter of the gross negligence variety, as we graduate upward, the State will not be permitted to take its case to the jury simply by proving a *prima facie* case of ordinary negligence. It must meet an additional and higher burden of production by showing such gross negligence, above and beyond mere civil negligence, as to evidence 'a wanton or reckless disregard for

human life.' There are a number of cases where ordinary negligence has been established or assumed but where the evidence was nonetheless held, as a matter of law, to have been legally insufficient to have permitted the jury even to consider a manslaughter verdict based on gross criminal negligence.... We hold that the evidence was not legally sufficient to permit a finding of gross criminal negligence on the part of the appellant and that the charge of manslaughter, therefore, should not have been submitted to the jury.... Alternatively, we hold that the evidence was not legally sufficient to permit a finding that any action of the appellant, even if assumed to have been grossly negligent, was the proximate cause of the decedent's death and that the charge of manslaughter, therefore, should not have been submitted to the jury.").

85. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994).

criminal. After three days of trial, it took them just an hour and a half to come to that conclusion, which the Court today undoes.

There are two aspects of this case that I believe the Court overlooks. First, for an act to be reckless, the risk that it creates must be unjustifiable.[1] What differentiates this case from the scenarios posited by the Court is that here, leaving the children with a lit candle was—for so many reasons—unjustifiable. Appellant could have left the girls at the home where they lived with their grandmother. She could have left them with their father, who had come by the house expecting to pick them up for the weekend. There was no pressing need to move them to a dangerous house.[2] But even if one were to conclude that appellant's wish to be with her children at her boyfriend's house justified taking them there, there was no need to light the candle. There was normally enough light in the bedroom from the streetlight in the alley. And finally, of course, there was no justification for failing to blow out the candle. Appellant's mother testified that appellant probably would have put out the candle if she had been there. This, again, is evidence of recklessness in that it shows appellant knew it was important to blow out the candle, yet failed to do so. Instead of returning from the store with chips and Little Debbies, as she had told her boyfriend and her children she would,[3] she stayed out for hours, not returning until she heard that the girls had died, the snacks discarded in the van where she was when she heard the news.[4]

The fact that appellant failed to return when she said she would is the second aspect of the case that the Court's analysis seems to overlook. Bowden assumed responsibility for the girls while appellant went to the store, but he expected her back hours before the fire.[5] The Court states that "there is nothing to suggest that ... appellant, had she been there, would have prevented this tragedy."[6] But there is evidence in the record that directly suggests it. Appellant had told her mother she always made sure the candles were out when she went to sleep. Her mother testified that she believed appellant, if she had been there, probably would have put out the candle. Had she returned and blown out the candle, the fire would not have happened. Had she returned and failed to blow out the candle, no one would be arguing that she was not responsible. Either way, she is responsible for the fire because she failed to return when she said she would.

Moreover, the Court discounts the evidence that appellant knew the risk because people sometimes disregard a mother's advice.[7] But the jury wasn't bound to be-

---

1. Tex. Penal Code § 6.03(c).

2. Bowden had lived there for less than two weeks, so there was no long history of safe visits.

3. This was according to appellant's own statement. The Court seems to place more weight on the evidence that appellant told Bowden she was going out to see friends, but the jury was entitled to instead believe appellant's account of what she said.

4. Appellant was a prostitute.

5. While it seems clear that Bowden loved the girls and was distraught at their deaths, I disagree with the Court's implication that the record shows that he was a reliable and responsible person. I find virtually no testimony regarding his actions in the days and years before the fire to suggest either that conclusion or the contrary. The lack of such evidence should be held against appellant—not in her favor.

6. Court's op. at 765.

7. Id. at 758.

lieve that appellant did so. There was plenty of evidence from which the jury could conclude that appellant knew that it was risky to take the girls to Bowden's house to spend the night. First, appellant's mother had told her that it was dangerous precisely because of the fire hazard. Appellant did hear this warning— she later told police that she should have brought them home, "like mama said." Second, when appellant happened upon the girls' father that night, she told him the girls were "at grandma's," which was untrue.[8] It is in no way unreasonable for the jury to take all this as evidence that appellant was aware of the risk of fire and, because of this awareness, thought she needed to hide the truth about where the girls were from their father. No other explanation for the lie presents itself from the record.

In my opinion, these two aspects of the case—the unjustifiability of the risk and the failure to return—are sufficient to rebut the Court's conclusion. But I also believe it is important to address at least some of the other statements in the Court's opinion with which I disagree most strongly.

First, the Court suggests that "the acts that the State has alleged do not constitute a criminal offense under the totality of the circumstances."[9] I disagree; I think that the indictment did allege a criminal offense. Second, the Court seems to read "recklessness" to encompass only "conscious indifference,"[10] but the statutory definition of recklessness—"consciously disregard[ing] a substantial and unjustifiable risk that ... the result will occur .... [and such] risk ... be[ing] of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances"[11]— seems to be somewhat broader than the Court's reading.

Third, I cannot agree with some of the Court's comments regarding the likelihood of dying in fires or the reasonableness of certain types of conduct around fire. I think the Court goes too far in saying, "Staying in a structure without utilities does not increase the likelihood of dying in a fire."[12] I do not believe that the statistics cited by the Court support this conclusion.[13] The Court's statement that taking children to a house without utilities "cannot, either by itself or in combination with other acts, support a finding of criminal recklessness under these circumstances"[14] is too expansive.

I also cannot agree with a number of the Court's statements regarding "foreseeabil-

---

8. One witness testified that appellant said the girls were at "home" but another testified specifically that appellant said they were "at grandma's" house. The jury was entitled to believe that appellant used the words "at grandma's."

9. *Id.* at 750.

10. *Id.* at 751–52 (referring to "devil may care" or "not giving a damn" attitude).

11. Tex. Pen.Code § 6.03(c).

12. *Id.* at 757.

13. For instance, most homes have utilities, so it's not particularly significant that only fif-

teen percent of home fires were attributable to open fires. The cited statistics do not address what proportion of homes without utilities have open fires or whether homes with utilities are less likely to have fires than homes without. Besides, a house without utilities presents its own additional problems, not found in the camping scenario or in a house with utilities. The children in this case were in a room with only one usable exit, which was blocked by the fire. The absence of running water can affect the ability to put out a fire. Electricity might have been used to run a smoke or carbon monoxide detector.

14. *Id.* at 757.

ity."[15] "Foreseeability" is not expressly a part of Texas's criminal law of causation, and I see no need at this time to import it as an aid in determining "but-for" causality. Even if we were to consider foreseeability, I disagree with several of the Court's statements. I do not agree that Bowden's moving the candle was unforeseeable, especially since appellant had left it on the bed where the girls slept. I also cannot agree that one could not foresee the possibility that clothing or a sheet would fall on the burning candle or that Bowden would not be able to get the children out of the house if a fire started. Both of those events were eminently foreseeable. Even Bowden's falling asleep without blowing out the candle was not completely unforeseeable, especially since appellant failed to return when she said she would.

I would also caution against relying upon socioeconomic studies in formulating rules of law. As an appellate court, our task is to construe statutes in accordance

with the legislative intent, not to implement our own notions of what constitutes good policy.[16]

The court of appeals carefully examined the evidence, applied the appropriate standard for reviewing sufficiency of the evidence, and gave proper deference to the jury's implied credibility decisions. I agree with that court's reasoning and its conclusion, and I respectfully dissent to the reversal of appellant's conviction.

---

**15.** *See id.* at 764.

**16.** The Court relies upon the Collins study for the proposition that " 'parents in blue collar professions and parents who were unemployed were four times more likely to be prosecuted than parents from wealthier socioeconomic groups' for fatal accidents involving children." *See* Court's op. at 41 n. 81. Collins's study involved a *subset* of children who died from fatal accidents: those "who died of hyperthermia as a result of being left unattended in an automobile." And factors related to the nature of the crime were strongly correlated to the decision to prosecute: "prosecutions were initiated in every case where the responsible party left the child in the car deliberately" in contrast to cases in which the person forgot the child was in the car and "[p]rosecutions were initiated in virtually every case where any sort of aggravating factor was present," such as drug or alcohol use. Collins acknowledged that the socioeconomic disparity could result from a correlation between socioeconomic status and

these other factors, but after conducting a multiple regression analysis, she determined that "socioeconomic status was an independently significant factor in prosecutorial decisionmaking." She did not, however, reveal the residual amount of disparity, other than to say that it was "statistically significant in terms of patterns of prosecutorial decisionmaking at more than a ninety-nine percent confidence level." The question remains whether that residual disparity is due to the overly aggressive prosecution of parents of lower socioeconomic status or due to the overly lenient treatment of more affluent parents. Collins's primary argument is "that prosecutors are in fact employing a 'suffering discount' for parents" and that the authorities should be *more* willing to charge parents when children are harmed by a parent's grossly negligent or reckless conduct. *See* Jennifer Collins, *Crime and Parenthood: The Uneasy Case for Prosecuting Negligent Parents,* 100 Nw. U.L.Rev. 807, 809, 820, 828–830, 832, 853, 854–55 (2006).