**Opinion issued February 7, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-12-00040-CR**

_____

**QUENTIN JARROYD WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 62073**

---

**MEMORANDUM OPINION**

A jury found appellant, Quentin Jarroyd Williams, guilty of the offense of

murder[1] and assessed his punishment at confinement for life. In two issues,

---

[1] *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

appellant contends that the evidence is legally and factually insufficient to support his conviction and the trial court erred in denying his motion for a directed verdict and not including "appropriate language to the application paragraph [of its charge to the jury] that referenced or incorporated" the instruction on law of parties.

We affirm.

## Background

Clute Police Department ("CPD") Officer A. Standley testified that at approximately 5:25 a.m. on April 18, 2010, he heard five or six gunshots and learned that the shots came from the Fisherman's Wharf apartments. Standley and other officers began a search of the apartment complex and found empty shell casings and a door with bullet holes in it. When no one responded from inside the apartment, CPD Officer J. Houk knocked down the door to determine if anyone had been hurt and found the complainant, Richard Morgan, deceased, lying on his back just inside the door.

CPD Detective K. Stanford testified that he was dispatched to the crime scene and later worked as an investigator on the case. He noted that the shell casings found at the crime scene were from an "SKS assault rifle." Stanford opined that the location of the bullet holes, just below the peephole in the complainant's apartment door, reveal that the shooter had an intent to kill. Stanford later contacted Tiffany Morgan, the complainant's sister, about the

2

murder, and she suggested that he contact Emily Terrell, who was dating the complainant and had dated appellant. Morgan also told Stanford that appellant had threatened Terrell. And based on information obtained from Terrell, Stanford contacted Jake Sohrt, appellant's roommate, who gave Stanford a statement implicating appellant and his cousin, Brandon Williams. Sohrt told Stanford that appellant had planned to shoot the complainant.

Terrell testified about her two-year "on and off" relationship with appellant. At the beginning of April 2010, Terrell broke off the relationship with appellant. Soon after, appellant went to the Chick-fil-A restaurant where Terrell worked, and police had to be called to tell him to stay away from her. After that incident, Terrell stayed with her brother for one week and bought a new cellular telephone because she was afraid of appellant. Terrell also received from appellant, via Facebook, messages in which he threatened her and a man that he thought she was dating; he warned that there would not be a "good ending" for either of them. Terrell also received a threatening telephone message from a female caller on April 15, 2010.

On April 16, 2010, Terrell received from appellant a Facebook message in which he told her that he knew she was dating the complainant. Appellant warned her that he would see "Ray Ray," which was the complainant's nickname, soon. The next day, Terrell went out with the complainant with whom she had been

3

friends for several years.  On April 18, 2010, Terrell received the following

Facebook message from appellant:

> I know about you and this ray ray guy!!  His real name is richard, and his sister is named tiffany . . . lol!!  You really downgraded yourself this time, but lil ray ray will be seeing me real soon. "don't matter you won't be with him for long.  I got people watching his apt as we speak.  And I know he's about to move and i know where thats at also.  And next time you start walking around the neighborhood with your black girlfriends again make sure to look behind you.  All i want to do is talk to you…plz call.

Terrell explained that after reading the Facebook message she contacted the

complainant and warned him to be careful.

Diane Cross, a resident of Fisherman's Wharf apartments, testified that she

knew the complainant and many of their neighbors.  The day before the

complainant was killed, she saw two men that she did not know and had never seen

before walking around the apartment complex.  Cross noted that the men walked

past her twice, and she identified appellant as one of the two men.

Allison Cowan, who had been in a relationship with appellant, testified that

to please him and at his request, she made a threatening telephone call to Terrell.

Cowan explained that appellant had told her that Terrell was an ex-girlfriend who

had cheated on him with a man named Ray Ray and he was angry about it.  On

April 18, 2010, appellant called Cowan and told her that his cousin had shot and

killed Ray Ray while he was in a car "around the corner" and heard the gunshots.

Appellant stated that he thought that his cousin was just going to point a gun at the

4

complainant and rob him, but Cowan suspected that appellant was leaving out some details of his involvement in the murder.

Sohrt testified that appellant was staying with him before the murder and that appellant frequently called Terrell until there was an incident at the Chick-fil-A restaurant where Terrell worked. Sohrt told Stanford that although appellant had gone to Temple, Texas prior to the murder, he returned to Houston on April 17, 2010, after he found out that Terrell was dating the complainant. Sohrt explained that on that date upon returning home, he found Williams and appellant in his apartment and appellant told him that Williams was going to kill the complainant. Appellant explained that he would drop Williams off near the complainant's apartment, Williams would shoot the complainant, and then Williams would walk back to the car. Specifically, Williams was to knock on the complainant's door and then shoot when the complainant looked through the peephole. Appellant showed Sohrt the weapon that Williams was to use and appellant took it out of the house covered with a blanket. Sohrt did not think that appellant and Williams would actually go through with the plan, but appellant called him the next day to say that they had done it. He then asked Sohrt to tell law enforcement that he was in Temple, Texas when the complainant was murdered.

CPD Detective S. Harris testified that he contacted appellant who provided him with one written statement and two oral statements. In his written statement,

5

appellant said that Williams offered to "beat up" and "shoot up" the complainant for appellant because he was dating Terrell, but appellant told him not to do it. Appellant acknowledged that he "slipped," however, and told Williams where the complainant lived and what kind of car he drove. After Williams had brought guns into appellant's apartment, appellant told Williams that if he was going to do anything, to just scare the complainant. Appellant explained that although he told Williams again not to do anything to the complainant, Williams left appellant's apartment at 2:30 or 3:00 a.m.; appellant "did not take any part in [the] shooting."

In a subsequent recorded interview, appellant changed his statement, admitting to drawing a map of the Fisherman's Wharf apartment complex so that Williams would know where the complainant lived. He explained that Williams planned to kick down the complainant's door, knock him down, and put a gun to his head. Appellant admitted that he and Williams had also discussed shooting the complainant under the peephole when he came to the door and looked through the peephole. Appellant noted that Williams had driven him to the complainant's apartment with the gun in the car. Although he said that he was later dropped off in Angleton and walked back to Lake Jackson, he later said that he spent the night in Houston.

After appellant provided his second statement, CPD officers arrested Williams, who told Detective Harris where to find the murder weapon. In his

6

interview with Harris, Williams said that appellant had the "idea" to murder the complainant to hurt Terrell because she had a new boyfriend. However, appellant did not "have the guts" to shoot the complainant himself. Williams noted that it was appellant's plan for Williams to shoot through the door just below the peephole when the complainant looked through it. Also, appellant planned where to park at the apartment complex and the route that they would take in leaving the crime scene.

Harris further testified that after he arrested appellant, he, in his third interview, again changed various details of his statement. Harris explained that appellant admitted that he knew that a shooting would take place and he drove with Williams to the Fisherman's Wharf apartment complex and dropped him off in front of the complainant's apartment. Although he admitted that he knew what was going to happen and Williams had a loaded gun with him in the car, appellant told Harris that he told Williams not to shoot the complainant, but merely to scare him.

Brazoria County Medical Examiner Nobby Mambo testified that he conducted an autopsy on the complainant's body. The complainant received four or five gunshot wounds to his hand, leg, chest, and abdomen. Moreover, abrasions on the bullets found in the complainant's body suggest that they went through an intermediate object before hitting the complainant. And Houston Crime Lab

7

firearms analyst Kim Downs testified that the four bullets found at the crime scene and the two bullets recovered from the complainant's body were fired from Williams's gun.

## Sufficiency of the Evidence

In a portion of his first issue, appellant argues that the evidence is legally and factually insufficient to support his conviction because "[a] rational trier of fact could not have found proof of intent or knowledge beyond a reasonable doubt." In his second issue, appellant argues that the trial court erred in denying his motion for directed verdict because the evidence is legally insufficient to support his conviction. He asserts that it is "an undisputed fact that co-defendant Brandon Williams was the individual who shot" the complainant and not him and there is no evidence that he caused the complainant's death.

We note at the outset that the Texas Court of Criminal Appeals has held that a trial court's failure to directly incorporate a parties charge into the application paragraph of the jury charge does not create a sufficiency issue. *See Adames v. State*, 353 S.W.3d 854 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). Thus, to the extent that appellant raises evidentiary sufficiency in his first issue to challenge the evidence supporting his conviction as a principal actor as alleged in the indictment and discussed in the application paragraph of the jury charge, we overrule that challenge.

8

We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id*. We now review the factual sufficiency of the evidence under the same appellate standard of review as that for legal sufficiency. *Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd.).

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Penal Code Ann. § 19.02 (Vernon 2011).

9

The evidence produced at trial was sufficient to support appellant's conviction as a party to the murder of the complainant. Cross, a resident of Fisherman's Wharf apartments, testified that appellant was one of two men that she saw walking around the apartment complex the day before the complainant was killed. Terrell, appellant's ex-girlfriend, testified about her tumultuous relationship with appellant and the threats, which were admitted into evidence, he made to her and the complainant via Facebook. Cowan, appellant's girlfriend, testified that she made a threatening telephone call to Terrell at appellant's request. And Sohrt, appellant's roommate, testified that appellant told him that his "plan" was to drop off Williams at the apartment complex to shoot the complainant and then pick up Williams so they could drive away. Moreover, appellant showed Sohrt the weapon that Williams owned, and he called Sohrt the day after the murder to confirm that they had killed the complainant. Appellant then asked Sohrt to tell law enforcement that he had been in Temple, Texas at the time of the murder. Appellant made statements to police officers admitting that he drew a map of the complainant's apartment complex so Williams would know where to find him. Appellant admitted that he drove Williams to the complainant's apartment, knew that he had a loaded weapon, and waited in the car while Williams shot the complainant. Williams told police officers that although appellant did not "have

10

the guts" to shoot the complainant himself, the murder was appellant's idea as he wanted to hurt Terrell because she had a new boyfriend.

Viewing the evidence in the light most favorable to the verdict, we hold that it is sufficient to support appellant's conviction as a party to the complainant's murder. Accordingly, we further hold that the trial court did not err in denying his motion for directed verdict.

We overrule the portion of appellant's first issue in which he challenges the sufficiency of the evidence and his second issue.

**Jury Charge**

In a portion of his first issue, appellant argues that the trial court erred in not including "appropriate language to the application paragraph [of its charge to the jury] that referenced or incorporated" its instruction of the law of parties because "a charge which fails to apply the law to the facts is insufficient to authorize conviction on that theory." *See Garrett v. State*, 749 S.W.2d 784, 802–04 (Tex. Crim. App. 1988) (op. on reh'g), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997). Appellant asserts that a proper jury charge on the law of parties includes both an abstract and an application paragraph and reversible error occurs when the application paragraph does not contain an application of the law of parties to the facts. *See Marvis v. State*, 3 S.W.3d 68, 70 (Tex. App.—Houston [14th Dist.] 1999), *rev'd on other grounds*, 36 S.W.3d 878

11

(Tex. Crim. App. 2001). Appellant acknowledges that he did not object to the jury charge below, but asserts that when no objection is made in the trial court that the proper harm analysis is the egregious harm standard articulated in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

Here, although the jury charge included an instruction on the law of parties, it did not apply the law of parties to the elements of murder in the application paragraph.

The submitted charge provided in part:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another, for which he is criminally responsible, or by both.
> A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.
> In a prosecution in which a defendant's criminal responsibility is based on the conduct of another, the defendant may be convicted on proof of commission of the offense and that he was a party to its commission, and it is no defense that the person for whose conduct the defendant is criminally responsible has not been prosecuted or convicted, or has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution.
> Now, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of April, 2010, in Brazoria County, Texas, [appellant] did then and there intentionally and knowingly cause the death of [the complainant] by shooting [the complainant] with a deadly weapon, to wit; a firearm, then you will find [appellant] guilty of the offense of Murder as charged in the indictment; or if you find from the evidence beyond a reasonable doubt that on or about the 18th day of April, 2010, in Brazoria County, Texas [appellant] did then and there with intent to cause serious bodily injury to [the complainant] commit an act clearly dangerous to human life, to-wit,

12

did shoot [the complainant] with a deadly weapon, to-wit; a firearm, which caused the death of [the complainant] then you will find [appellant] guilty of the offense of Murder as charged in the indictment.

When a definition or instruction on a theory of law, here, the law of parties, is given in the abstract portion of the jury charge, the application paragraph must "(1) specify 'all of the conditions to be met before a conviction under such theory is authorized'; (2) authorize 'a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers;' or (3) 'contain[] some logically consistent combination of such paragraphs.'" *Vasquez v. State*, No. PD-0321-11, 2012 WL 4511366, at *4 (Tex. Crim. App. Oct. 3, 2012) (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)). The Texas Court of Criminal Appeals has held that a trial court errs instructing the jury abstractly on law of parties, but not applying the law in an application paragraph of a jury charge. *See Campbell v. State*, 910 S.W.2d 475, 477 (Tex. Crim. App. 1995). Appellant acknowledges, however, that he did not object to the jury charge as submitted at trial.

When a defendant fails to object to a jury charge at trial, the error will not result in reversal "unless it was so egregious and created such harm that [the defendant] was denied a fair trial." *Warner v. State*, 245 S.W.3d 458, 461 (Tex.

Crim. App. 2008) (quoting *Warner v. State*, No. 03–04–00203–CR, 2005 WL 2313591, at *4 (Tex. App.—Austin Sept. 22, 2005, pet. granted)).

To determine if "egregious harm" has occurred, a reviewing court examines "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. The defendant must have suffered actual and not theoretical, harm. *Id*. at 174. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Warner*, 245 S.W.3d at 461–62 (quoting *Warner*, 2005 WL 2313591, at *5). We apply the egregious harm analysis to all jury-charge error, including the failure, such as here, to specifically apply the law of parties in the application paragraph of the jury charge. *Vasquez*, 2012 WL 4511366, at *5.

Under the first *Almanza* factor, we examine the entire jury charge. Here, immediately above the application paragraph, the charge contains three paragraphs correctly defining criminal responsibility as a party based on the conduct of another. Appellant makes no argument on appeal as to how these abstract definitions on law of parties might have misled or confused the jury. A reasonable jury would be able to refer to the abstract definition of the law of parties without

14

having it repeated again in the application paragraph. *See Vasquez*, 2012 WL 4511366, at *6.

Under the second *Almanza* factor, we examine the evidence at trial. There is no question that the only theory of appellant's liability offered by the State at trial was that of acting as a party to the murder. According to the State's evidence, appellant planned the murder and drove Williams to the scene, waited for him in his car, and then drove Williams away from the crime scene. No evidence suggests that appellant shot the complainant or went to his apartment door with Williams. Although statements to law enforcement changed, appellant admitted that he drew a map so that Williams would know where the complainant lived and told him what kind of car the complainant drove. In his third and final statement to Detective Harris, appellant admitted that he drove Williams to the complainant's apartment and knew that a shooting would take place. From this evidence, the jury could have reasonably inferred that appellant "solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid" Williams to commit the offense.

Finally, under the third *Almanza* factor, we examine the arguments of counsel at trial. The State argued that appellant provided information to Williams, encouraged him to shoot the complainant, and drove him to and from the crime scene. The State quoted to the jury the abstract definition of party liability in the jury charge and argued the application of that definition to the facts of the case.

15

And it argued that appellant solicited Williams to commit the murder and encouraged Williams to murder the complainant even though Williams did not know the complainant. The State also argued that appellant directed Williams to the complainant by drawing a map so that he would know exactly where to find the complainant and how to leave after the crime scene. The State went on to state specifically, "I know [appellant] did not pull the trigger. I know he did not do the shooting. He did all the planning."

In his argument to the jury, appellant's counsel also acknowledged the shooting by Williams and admitted that appellant was with Williams. But he asserted that Williams made the ultimate decision to commit the murder. Thus, both sides were consistent in their arguments to the jury that Williams was the shooter. The focus of the argument was on whether appellant was guilty as a party to the offense and not whether he acted as a principal.

Appellant makes no argument or suggestion that the jury might have been confused by the abstract instruction on party liability in the court's charge and there is nothing in the record to suggest that the jury was confused or misled by the instruction. When the law of parties has been correctly defined in the abstract portion of a jury charge, it is unlikely that any error in failing to include that definitional language in the application paragraph would make any practical difference to a jury. *See Vasquez*, 2012 WL 4511366, at *7. This is particularly

16

true if the law of parties is the focus of the evidence at trial and correctly explained and argued. *Id*.

After reviewing the record, we conclude that the jury could not have been misled by the court's charge. Applying the *Almanza* analysis, we hold that appellant's rights were not harmed by the trial court's error in not including the appropriate language regarding party liability in the application paragraph of the jury charge.

We overrule the portion of appellant's first issue in which he challenges the trial court's failure to include appropriate language in the application of the charge to the jury on the law of parties.

**Conclusion**

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).