

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00016-CR

_____

LARRY WAYNE ADAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 3rd District Court
Anderson County, Texas
Trial Court No. 30793

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

Although the State had charged Larry Wayne Adams with both intoxication manslaughter and manslaughter, the Anderson County jury[1] found him not guilty of intoxication manslaughter but convicted him of manslaughter with a deadly weapon finding. *See* TEX. PENAL CODE ANN. § 19.04 (West 2011). The trial court, whom Adams elected to assess punishment, assessed punishment at and sentenced Adams to twenty years' imprisonment. Adams' sole issue on appeal is that the verdict "is not supported by constitutionally sufficient evidence."[2]

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the judgment of the trier of fact to determine whether any rational jury could have found the essential elements of the offense to have been proved beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Id.* at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Our review involves determining "whether the necessary inferences

---

[1]Originally appealed to the Twelfth Court of Appeals in Tyler, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Tyler Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]The substance of Adams' brief indicates the phrase "constitutionally sufficient evidence" is intended to refer to the legal sufficiency standard of *Jackson v. Virgina*, 443 U.S. 307 (1979). The State argues that Adams' brief fails to provide adequate citations to the record and fails to apply the caselaw cited to the facts of this case. While it is true that Adams' brief could contain more complete citations to the record, the balance of Adams' brief is a professional and competent presentation of the case. We overrule the State's argument that this appeal is inadequately briefed.

made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

The yardstick by which evidentiary sufficiency is measured is as against a "hypothetically correct jury charge," which includes (1) allegations that form an integral part of an essential element of the offense, including allegations that are statutorily alternative manner and means, and (2) material variances. *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012). The State was obligated, under the hypothetically correct jury charge, to prove that Adams recklessly caused Keith Gardner's death. *See* TEX. PENAL CODE ANN. § 19.04.

The evidence at trial showed that shortly before nine o'clock in the evening, Keith Gardner, Lloyd Cary, and Adams (who was accompanied in his vehicle by his son, Lamarcus Adams, and Millicent Whitt) were all traveling west on Court Drive, a stretch of rural road in Palestine, Texas. Gardner was riding a Harley-Davidson motorcycle, and Adams was driving a pickup truck.

Cary testified that at that time, he was bringing pizza home and was driving "close to the speed limit because [he] wanted to get home to see the Maverick game." As Cary approached the start of a hill and the end of a passing zone, a truck passed Cary in the left-hand lane. Cary testified that he "never saw the truck that passed [him] until it past [sic]" and that the truck was going "pretty fast." When asked to estimate the speed of the passing truck, Cary described it as being "like on the inter state [sic] when a truck passes you it blows past you." Cary reached the top of the hill very quickly and witnessed a collision between the truck that had just passed him and a motorcycle. Although he expressed uncertainty at the conclusion, Cary testified that it was

3

his belief that the motorcycle had attempted to turn left and had run into the side of the pickup truck. Cary testified that "the pickup was more on the left-hand side than on the right-hand side" of the roadway.

Court Drive is a two-lane road[3] with a speed limit of fifty miles per hour (m.p.h.). The collision occurred on a stretch of the road marked for passing.[4] Trooper Jason Rolison, a state trooper with the Texas Department of Public Safety (DPS), testified the stretch should not have been marked for passing because Section 545.056 of the Texas Transportation Code prohibits passing within one hundred feet of an intersection. *See* TEX. TRANSP. CODE ANN. § 545.056 (West 2011).

When Officer Marcos Lara, an officer with the City of Palestine Police Department, arrived at the scene, he observed marks that indicated that a heavy object had been dragged across the pavement which led to a heavily damaged motorcycle lying in a driveway on the north side of Court Drive. He also saw a pickup truck in the woods approximately thirty to forty feet from Court Drive and Gardner's dead body lying approximately fifty feet from the motorcycle. The speedometer of the motorcycle reflected a speed of twenty-five m.p.h. when it had ceased functioning.

---

[3]The phrase "two-lane road," as used here, refers to a road sufficiently wide to accommodate one lane of traffic simultaneously traveling in each direction.

[4]The photographs of the scene document that the marking on the center of the road consisted of one solid, yellow line in the lane opposite the direction of travel of these vehicles and a dashed yellow line on the lane in which the vehicles were traveling. Although the photographs do not indicate which lane was westbound, we presume the lane in which passing was permitted was the westbound lane because the testimony at trial was uncontested that the westbound lane was marked as a passing zone.

Adams admitted to having been the driver of the pickup truck. Adams initially told Officer Lara that he had been travelling westbound in the westbound lane when the collision occurred and did not know where the motorcycle had come from when they collided. In a video-recorded statement taken later at the scene, Adams stated he was passing a car and was still in the oncoming eastbound lane when he heard a crash. In that recorded interview, Adams admits that he did not know where the motorcycle came from other than in the westbound lane in front of the car. At the conclusion of the video recording, Adams speculates that the motorcycle must have been turning left when he collided with it.

Approximately one hour and twenty-five minutes after the accident, the authorities drew a sample of Adams' blood. Although Karen Ream, a chemist with the Texas DPS, detected alcohol and hydrocodone in Adams' blood, the alcohol concentration was below the legal limit,[5] and the amount of hydrocodone was below the lower range of therapeutic thresholds.[6] Although the State presented testimony regarding the alcohol-elimination rates by the actions of the human body,[7] the State presented no evidence pertaining to retrograde extrapolation.[8] Ream did testify

---

[5]The alcohol concentration was 0.06 grams per one hundred milliliters.

[6]Ream testified the therapeutic range of hydrocodone is 0.02 mg/L to 0.04 mg/L. Adams' blood had 0.01 mg/L of hydrocodone, which Ream testified was "pretty low."

[7]Ream testified the average alcohol-elimination rates are between 0.15 to 0.03 grams of alcohol per one hundred milliliters per hour. Adams does not challenge the admissibility of this evidence on appeal.

[8]The indictment does not specify which theory of intoxication was being alleged, and the jury was instructed on both theories. In order to prove "per se" theory intoxication, the Texas Court of Criminal Appeals has noted that although a defendant's blood-alcohol concentration is highly probative, there must be evidence of "either (1) expert testimony of retrograde extrapolation, or (2) other evidence of intoxication that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test." *Kirsch v. State*, 306 S.W.3d 738, 745–46 (Tex. Crim. App. 2010).

that the alcohol and hydrocodone, working together, could have the effect of enhancing the depressive (drowsiness) effect that each of them would have if it were consumed alone.

Approximately five days after the accident, Adams told Officer Chad McCallister, a police officer with the City of Palestine Police Department, that at the time of the collision, he was travelling at a rate of speed—between sixty and sixty-five m.p.h. McCallister, based on measurements of the skid marks at the scene, conducted accident reconstruction calculations and estimated that Adams' minimum speed would have been sixty-nine m.p.h. Trooper Rolison also conducted accident reconstruction calculations and estimated Adams' speed at the time of the accident to have been between sixty-four and sixty-seven m.p.h., only slightly different from McCallister's calculated estimation.

At trial, Lamarcus Adams testified that he was a passenger in Adams' vehicle at the time of the collision and that he had seen Gardner activate his left turn signal only "[a]t the last minute" before the vehicles collided. Lamarcus also testified that he neither knew the speed limit on Court Drive nor was he able to see Adams' speedometer at the time of the accident from where he was sitting in Adams' truck.

Adams argues in his appellate brief that "the whole gist of Officer Lara's testimony, is that he did not detect any impediment in the mental or physical faculties of the Appellant." Although we do not completely agree with that characterization of Lara's testimony, we concur that there is evidence that Adams' mental and physical faculties were not impaired by the drugs or alcohol later found in his system. Although Lara testified that he did not suspect during his investigation of the accident that Adams was intoxicated, he also observed that some intoxicated

6

persons "physically they appear to be not as intoxicated" as they actually are. In the video-recorded statement taken at the scene, Adams gave no outward sign of intoxication and answered questions posed to him quickly and coherently. As noted above, Adams' blood-alcohol concentration was less than the legal limit,[9] and the hydrocodone level was less than the lower end of the therapeutic range. Most importantly, we note that the jury (the trier of fact here) rejected the charge of intoxication manslaughter.

The Texas Court of Criminal Appeals, however, has rejected the argument that an acquittal for intoxication manslaughter prevents a jury from considering alcohol use along with other conduct in concluding the defendant's conduct was reckless. *Zuniga v. State*, 144 S.W.3d 477, 487 (Tex. Crim. App. 2004), *overruled on other grounds by Watson v. State*, 204 S.W.3d 404, 415–17 (Tex. Crim. App. 2006), *overruled by Brooks*, 323 S.W.3d at 911. Similar to this case,[10] the jury in *Zuniga* acquitted Zuniga of intoxication manslaughter but convicted him of manslaughter, which "apparently referred to the third paragraph of count one of the indictment" indicating that the conduct that the jury had found reckless was the impairment. *Zuniga*, 144 S.W.3d at 485. The Texas Court of Criminal Appeals held that the court of appeals erred by treating the verdict as a special verdict and by not considering all of the evidence, including the evidence of impairment, the evidence of speeding, and the evidence of passing in a no-passing zone, when reviewing the manslaughter finding. *Id*. at 487. Similarly, we are required to

---

[9]One of the statutory definitions of "intoxicated" is "having an alcohol concentration of 0.08 or more." TEX. PENAL CODE. ANN. § 49.01(2)(B) (West 2011).

[10]We note that the indictment alleged Adams committed manslaughter "by driving at a speed greater than that which was reasonable and prudent for the circumstances when passing a vehicle and by having a measurable amount of alcohol and hydrocodone in his system."

consider all of the evidence including the speeding, the passing close to an intersection, the time of day, and any impairment due to alcohol and hydrocodone use. The jury apparently determined that the presence of alcohol and hydrocodone in Adams' system did not impair his ability to control the car; even so, the jury was still free to take into account that the presence of these substances could have had the effect of reducing the inhibitions against traveling at too high a rate of speed—a reckless situation.

Adams argues that there is insufficient evidence of recklessness citing *Williams v. State*, 235 S.W.3d 742 (Tex. Crim. App. 2007). The Texas Court of Criminal Appeals emphasized in *Williams* that reckless criminal liability cannot "be predicated on every careless act merely because its carelessness results in death or injury to another." *Id*. at 753. Reckless conduct requires "conscious risk creation" demonstrated by a "'conscious disregard of the risk created by the actor's conduct.'" *Id*. at 751 (quoting *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)). The court set out that a test to determine whether a defendant's conduct is reckless requires consideration of whether:

> (1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;
> (2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others");
> (3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and
> (4) the defendant consciously disregarded that risk.

*Id.* at 755–56 (citations omitted); *see* TEX. PENAL CODE ANN. § 6.03(c) (West 2011). Adams argues the evidence is insufficient for a rational jury to conclude beyond a reasonable doubt that he consciously disregarded a substantial and unjustifiable risk.

First, a rational juror could have concluded Adams' actions and condition, collectively, created a "substantial and unjustifiable" risk of the type of harm that occurred. As noted by the State, whether the facts create an unjustifiable risk is judged by the circumstances of each case. The State was not required to prove that Adams' acts would be reckless under all circumstances or that Adams' acts violated traffic laws (although it appears that Adams was, indeed, exceeding the posted speed limit at the time of the accident). The State was merely obligated to prove there were actions taken by Adams which, under the circumstances that existed that night, created a substantial and unjustifiable risk. The State established that at the time of the collision, night was falling and visibility was reduced, Adams passed Gardner at a high rate of speed, Adams passed Gardner close to an intersection, Adams neither applied his brakes nor made any other attempt to avoid the collision, and Adams had ingested both alcohol and hydrocodone. As noted by the State, Adams' speed was sufficiently high to prove lethal—particularly for a collision with a motorcycle. The skid marks indicated Adams did not brake or otherwise attempt to avoid the collision. While the alcohol and hydrocodone might not have been sufficient to render Adams intoxicated, a substantial risk existed that they would have caused Adams' reflexes to be somewhat slower than normal and that he may have been subject to reduced inhibitions due to their presence in his system. The jury could rationally conclude that Adams chose to pass a

9

motorcycle under circumstances that created a substantial and unjustifiable risk of a fatal collision.

Second, a rational juror could have concluded that disregarding the risks constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation. The jury could have concluded a reasonable person would have exercised considerably more caution than did Adams. A reasonable person would have decreased speed as night fell and visibility decreased. Cary testified that it was "pretty dark," and Lara testified that the sun was "just about to go away" when the dispatch was received. Adams, in his video-recorded statement, states that it was dark. When visibility decreases, a driver is unlikely to see others on the roadways at the same distance as when the visibility is good. Therefore, when driving after dark, the driver may have less time to react after spotting an obstacle; a reasonable person decreases speed to compensate for the decreased reaction time. A reasonable person would have also taken visibility into account when choosing whether to pass a motorcycle on a two-lane road. Irrespective of whether road signage or painted stripes exist on roadways, a reasonable person would likely have taken into account the intersection Adams was approaching and would have chosen not to pass a motorcycle at that location. A reasonable person would have attempted to watch the motorcycle and be aware of its movements. Adams initially told Lara that he did not know where the motorcycle had come from or where it was going. Adams told McAllister that he did not initially know what happened and first thought he might have struck a deer. These statements indicate that Adams did not make a sufficient attempt to observe the motorcycle as he passed it. The evidence supports a conclusion that Adams' disregard of the

10

multiple risks he took that night was a gross deviation from the standard of care that a reasonable person would have exercised.

Third, a rational juror could have concluded the defendant was consciously aware of the "substantial and unjustifiable" risk at the time of the exercise of that conduct. We note that mental culpability must normally be inferred from the circumstances. *See Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978). Additionally, the defendant does not have to be aware of the specific risk. *Trepanier v. State*, 940 S.W.2d 827, 829 (Tex. App.—Austin 1997, pet. ref'd). A rational juror could have reasonable inferred from the circumstances that Adams was consciously aware of the risk.

Fourth, a rational juror could have concluded from all of the inferences that can be drawn from the evidence that Adams consciously disregarded the existing risks. Further, Adams' inconsistent statements support such an inference. Lara testified that Adams' initial statements at the scene were inconsistent with his subsequent video-recorded statement. The inconsistent statements indicate a consciousness of guilt, which also supports an inference that Adams was consciously aware of the risks and disregarded them.

Other Texas courts have found the existence of recklessness under similar circumstances.[11] We conclude that a rational juror could have concluded, beyond a reasonable doubt, that Adams' conduct was reckless and that the reckless conduct caused Gardner's death.

---

[11]*Arellano v. State*, 54 S.W.3d 391, 392 (Tex. App.—Waco 2001, pet. ref'd) (driving seventy-three to eighty m.p.h. in a fifty-m.p.h. zone and went through stop sign); *Porter v. State*, 969 S.W.2d 60, 63 (Tex. App.—Austin 1998, pet. ref'd) (head-on collision where blood test indicated presence of methamphetamines, diazepam, and nordiazepam and urine test revealed presence of benzol, amphetamine, and cocaine); *Rodriguez v. State*, 834 S.W.2d 488, 489 (Tex. App.—Corpus Christi 1992, no pet.) (while intoxicated, 0.14, car went off road and skidded sideways into oncoming traffic killing another intoxicated driver, 0.19).

We affirm the judgment.


Bailey C. Moseley
Justice

Date Submitted:     August 28, 2013
Date Decided:       September 11, 2013

Do Not Publish