In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00353-CR

_____

**LLOYD WAYNE LOTSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 3**
**Jefferson County, Texas**
**Trial Cause No. 303455**

**MEMORANDUM OPINION**

Lloyd Wayne Lotson (Lotson) appeals his misdemeanor conviction for assault of T.G.[1], an adult female. *See* Tex. Penal Code Ann. § 22.01 (West Supp. 2014). The jury found Lotson guilty, and the trial court assessed punishment at one year of confinement. In one appellate issue, Lotson argues that the evidence was

---

[1] We identify the victim by using initials that disguise her identity. *See* Tex. Const. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

legally insufficient to support his conviction because the State failed to disprove his assertion of self-defense beyond a reasonable doubt. We conclude the evidence was legally sufficient to support his conviction and affirm the trial court's judgment.

EVIDENCE PRESENTED AT TRIAL

Testimony of T.G.

T.G. testified that she met Lotson after she moved to Beaumont in 2014. Lotson asked T.G. out on a date and T.G. told Lotson she was not looking for a romantic relationship. According to T.G., she and Lotson were only friends and they would "hang out" every other day or two. T.G. testified that Lotson was "a little bit too controlling" and he was "pushing the boundaries of the questions that he would ask [her]" regarding people he did not recognize that would show up at the house where she was staying. T.G. explained at trial that when she told him that she "didn't think it was really something he should be doing" and that "[i]t wasn't [her] house[,]" Lotson "kind of backed off and apologized." On some occasions, Lotson would upset T.G. "because he would come right back to that same thing." T.G. began to distance herself from Lotson and she would not answer his calls. T.G. testified that Lotson would "call and maybe text [T.G.] apologizing[.]" Prior to the assault, Lotson and T.G. had a disagreement and she

2

told him not to call her again. At some point, Lotson started calling T.G. again. T.G. admitted that she had sexual relations with Lotson on one occasion, but T.G. testified that she only considered Lotson a friend.

T.G. testified that on June 1, 2014, she was working at a dollar store when Lotson told her he needed to talk to her and said he could pick her up when she finished work that day. T.G. told him she did not know if she wanted to do that, and he said that he did not want to upset her. T.G. agreed and Lotson picked her up from the store after work. They made a few stops, including a stop to get groceries because T.G. had agreed to cook dinner. They also stopped at a store so T.G. could buy "[s]ome underwear, some soap, toothbrush, things like that[.]" T.G. testified that she did not know at that time if she would be staying the night with Lotson. According to T.G., she was "adamant about not staying the night with him."

Once they arrived at the garage apartment where Lotson lived, T.G. cooked dinner, they ate, and she took a bath. T.G. testified she consumed "no[] more than two" beers. According to T.G., they were getting along and T.G. felt like they had "kind of crossed a big hurdle[.]"At some point later, Lotson accused T.G. of "something going on" between T.G. and two other people. T.G. testified that she got upset, told Lotson that "[t]his is why we had issues before[,]" and she told him she wanted to go home. Lotson told her he was "not gonna let [her] leave this late."

3

She was unable to leave without a key to the deadbolt lock on the door. When she tried to get out of the door, Lotson grabbed her shoulder or her arm. According to T.G., she told him she would call her sister-in-law and then Lotson took her phone. She told him that if he would not give her the keys she would walk home. She then explained at trial that, when she could not get out the door, she went into the bathroom and tried unsuccessfully to get out of the bathroom window and hurt her arm in the process. T.G. testified that she was crying and cursing and "ready to fight" because she felt like Lotson was holding "[her] against [her] will and [she] wanted to go[,]" and he was "trying to talk [her] down" and convince her to stay. He grabbed her again and she told him not to put his hands on her and that if he did not let her leave she would fight him and "do whatever [she] ha[d] to do" to leave.

T.G. testified that she hit Lotson and they "tussled" because she felt like he was keeping her there against her will. She testified that she hit him when he was trying to restrain her and she could not get the keys. She attempted to get out the front window by breaking it and Lotson got angry. T.G. told Lotson she wanted to leave and he "got up to hit [her] again" and told her she was not going to leave. They ended up in another "tussle" and T.G. hit Lotson and he hit her and they ended up on the floor. He had one of her arms pinned down and had his body weight on her, and she continued to hit him in an attempt to get him off of her.

4

T.G. testified that Lotson punched her in the face and hit her head on the floor. According to T.G., Lotson was holding her down with his forearm, punching her, and telling her she could not leave. She explained at trial that she continued to hit him, she bit him, and she told him to let her go. She "blacked out" and the last thing she remembered from that night was Lotson punching her in the face. When she woke up the next morning, her "head didn't feel right[]" and she felt nauseated and "light headed." She asked Lotson if he would take her to the hospital and he told her he had to go to work. She still did not have her phone so she asked Lotson to call her sister-in-law to come get her, and he told T.G. that they will "think that [he] did this to [her]." She told him that if he took her to the hospital, she "wouldn't tell them that he did it[.]" He agreed to take her to the hospital, and he told her to say that she fell and hit her head.

According to T.G., once at St. Elizabeth Hospital emergency room, Lotson helped her walk because she was having trouble walking. A nurse took T.G. back to examine her and Lotson went to park the car or call his job. T.G. testified that she told the nurse that she had fallen and the nurse did not believe her. The nurse asked, "Did he do this?" and T.G. told the nurse, "No." The nurse asked again, "Did he do this?" Someone from the hospital called the police. Once T.G. was put

5

in a hospital room and being treated, but prior to the police arriving, Lotson came into the room.

T.G. testified at trial that when the officer arrived and asked T.G. what happened, she initially told the officer that she fell "or something like that" and then she told him that she was assaulted at a store. She testified that she told the officer that a man asked her for money and when she did not give him any money, she turned away and he attacked her. T.G. then explained to the jury that Lotson caused her injuries and that she felt like she had to make up a story about what happened to protect her family. According to T.G., she left the hospital and went home with her sister-in-law. T.G. testified that later that night Lotson called, and then the next day, he called again. Lotson told T.G. that he was checking on her and making sure she would not tell anyone "he did it" because he "would have problems." According to T.G., due to her injuries she spent the day of June 3, 2014, in bed recovering and could not leave the house. T.G. explained that she suffered a concussion and had "a lot of pain," and she was still under a doctor's care for the injury to her eye. T.G. testified that she and Lotson hit each other several times during the confrontation but that she was "fighting him back[.]"Photographs of T.G.'s injuries taken by law enforcement were admitted into evidence. T.G. testified that prior to moving to Beaumont she had been

charged with assaulting a police officer in Houston and that in the past she had also been assaulted by her son.

Testimony of Officer Williamson

Officer Williamson (Williamson) with the Beaumont Police Department testified that he was dispatched to St. Elizabeth Hospital emergency room on the afternoon of June 2, 2014, in reference to an alleged assault. Upon his arrival at the emergency room, Williamson was directed to a room where he spoke to T.G., the alleged victim. Williamson observed that T.G.'s "left eye was swollen and she had swelling and redness around her face[,]" she "had red marks around her upper body[,]" and "her right hand was red." Williamson agreed that, based on his observation of T.G.'s injuries, it appeared she had been assaulted.

Williamson testified that he asked T.G. what happened, and T.G. told him that the previous evening she had been at a store (a different store from the one where she worked), and an unknown black male approached her and asked for a dollar. Williamson said that T.G. told him that she told the man she did not have a dollar, the black male called her a liar, pushed her to the ground, and "started punching her in the face and upper body and slamming her head against the concrete." Williamson said T.G. told Williamson that she was surprised by the assault and fought back, but blacked out at some point. According to Williamson,

7

T.G. did not remember a lot of the details of the assault. Williamson explained at trial that the entire time he was talking with T.G. there was a black male with T.G. in the private hospital room and that the black male would answer Williamson's questions at times and Williamson would tell him that Williamson wanted to hear the answers from T.G. Because T.G. was unable to fill out a hand-written statement due to her injuries, Williamson gave T.G. a blank witness statement and a non-consent form in case she wanted to file a report.

Testimony of Detective Spikes

Detective Spikes (Spikes) with the Beaumont Police Department testified that on June 3, 2014, he received a report from the patrol division regarding the assault on T.G. Spikes explained at trial that on that same day, after reading Williamson's report, he called T.G. and asked her if she wanted to pursue charges. According to Spikes, T.G.'s voice was "real faint" and "like she was asleep" and he asked her about some inconsistencies in the report. He asked her why she had gone to another dollar store across town after she had just gotten off work at the dollar store where she worked, and he asked her why the manager at the dollar store where T.G. reported the assault took place told Spikes that an assault did not happen there that day. According to Spikes, T.G. then told him that it was actually Lotson who assaulted her, and she repeatedly told Spikes she was afraid of Lotson

8

and did not want him "to hurt [her] family if [she] told [Spikes] what happened." Spikes testified that T.G. had not turned in the witness statement that Williamson had given her.

Detective Spikes said that T.G. then agreed to speak about the case with Spikes in his office on June 5, 2014. Spikes testified that it took T.G. at least ten minutes to walk upstairs to his office and she was "barely walking" due to her injuries. He noticed that her eye was swollen shut and that she had a lot of bruises on her arms. Spikes took a typed statement and a video statement from T.G. A warrant was issued for Lotson's arrest. Spikes told the jury that it was common for victims to have inconsistent statements due to fear of the suspect retaliating against them. According to Spikes, Spikes asked Lotson's parole officer to contact Lotson and the parole officer told Lotson that Spikes was looking for him. Lotson then went to the police station, did not ask to speak to Spikes, but then filed a report claiming that he was assaulted by T.G.

Testimony of C.B.

C.B., T.G.'s brother, testified that he had met Lotson through T.G. and that Lotson had been coming over to C.B.'s house for a couple of months prior to the assault. C.B. explained that at first Lotson and T.G. were friends and then it

9

"looked like it was gonna become a relationship." At first C.B. was not concerned about T.G. and Lotson's relationship, but then "it got a little strange."

C.B. testified that he came home on June 3, 2014, after being out of town for work. While out of town, he learned that T.G. was in the hospital and that she could possibly lose her eye and had been badly beaten. According to C.B., when he arrived home, T.G. was there and "[s]he looked like she had been beat up[,]" had bruises all over her, and had a swollen eye. C.B. helped care for T.G. the rest of the day. C.B. testified that T.G. was too scared to leave the house and kept telling him that she did not want Lotson to come there. According to C.B., T.G. did not leave his house that day.

C.B. testified that on June 2, 2014, the day prior to him coming back to town, Lotson called him late at night and said that, when C.B. got back into town, he and C.B. needed to go somewhere quiet and talk about what happened with T.G. At first, Lotson told C.B. that Lotson and T.G. were "jumped" in front of the store where T.G. worked, and C.B. told Lotson he did not believe him. C.B. asked Lotson to tell him what really happened and the conversation got heated and Lotson insisted that he needed to speak with C.B. in person.

Testimony of Officer Campbell

Officer Campbell (Campbell) with the Beaumont Police Department testified that on June 6, 2014, he was dispatched to Lotson's address regarding an assault that Lotson reported happened on June 3, 2014, at approximately 1:30 in the morning. Lotson reported to Campbell that Lotson was asleep at Lotson's apartment when he was awakened by his girlfriend (T.G.) who was pacing back and forth through the apartment. Lotson told Campbell that T.G. was upset about Lotson's living arrangement, and Lotson said he tried to console her and asked her to calm down and come back to bed. Campbell explained that Lotson told him the girlfriend refused and she threw a cooking pot at him. Campbell testified that Lotson told him he grabbed T.G., wrapped his arms around her, she grabbed his testicles, and he pushed her down to the ground. Campbell said that Lotson told him Lotson then picked T.G. up off the floor to escort her out of the apartment but she ran to the bathroom and punched the window twice, breaking it. Campbell testified Lotson told him that T.G. left the apartment but a few hours later she wanted to come back in. Lotson said he let her back into the apartment and she told him she was not feeling well and wanted to go to the hospital. According to Campbell, Lotson later showed Campbell a bite mark on the left side of Lotson's chest and a small cut on Lotson's wrist. Campbell testified he gave Lotson a non-

11

consent form to sign if he wanted to press charges, a card with the case number on it, a witness statement, and a victim's assistance packet.

Testimony of Detective Phillips

Detective Phillips (Phillips) with the Beaumont Police Department testified that she received a report in reference to an assault family violence case in which it was alleged that Lotson was assaulted by T.G. Phillips explained at trial that she spoke to Officer Spikes about T.G.'s case. Phillips called Lotson regarding his report that he was assaulted by T.G. When Lotson met with Phillips on June 11, 2014, at the Beaumont Police Department, because of the other assault in which T.G. alleged that she was assaulted by Lotson, Phillips read Lotson his *Miranda* rights. Phillips explained at trial that Lotson came to the police station voluntarily and he was not under arrest at that time.

At the police station, Lotson told Phillips that Lotson and T.G. were asleep in his apartment; T.G. woke up and was pacing around the room intoxicated; T.G. accused Lotson of having a relationship with Lotson's landlady; T.G. started throwing pots and pans; Lotson grabbed her to restrain her; T.G. grabbed his testicles, and he "slammed her to the ground." Lotson told Phillips that T.G. left and came back about thirty minutes later and he got an ice pack for T.G.'s face. According to Detective Phillips, Lotson could not explain where T.G.'s injuries

12

came from and he appeared to be "trying to minimize that [T.G.] had injury." Lotson told Phillips that T.G. asked Lotson to take her to the hospital because she was hurting, and that he and T.G. discussed on the way to the hospital what they were going to tell the medical personnel about what happened. The Detective further testified that Lotson said he told T.G. she could tell the truth about what happened but that T.G. said she was going to say she was robbed in front of the dollar store.

Lotson showed the Detective scratches on his face, a bite mark on his chest, and a cut on his wrist, and "rambled" during the interview, and the Detective felt "[Lotson] was being untruthful with his story." Phillips explained at trial that she felt like he was "trying to defend himself in a case against him" and "didn't seem concerned about" the alleged assault by T.G. on Lotson. According to Phillips, based on Lotson's inconsistencies in his statement, she did not believe Lotson's version of what transpired, and she determined that T.G. did not assault Lotson. Lotson was arrested at Phillips' office.

Testimony of Lotson

Lotson testified that on the day of the incident, T.G. texted him while he was in church. He called her back and she wanted him to pick her up at 4:00 p.m. He testified he picked T.G. up from work and they went to a gym, to several stores

13

which he named in his testimony, but not the one where T.G. worked. According to Lotson, around 8:00 or 8:30 p.m., T.G. cooked dinner at his house, they took baths, and then ate dinner. Lotson testified that they went to bed around 10:00 or 11:00 p.m. "to go to sleep." According to Lotson, he woke up between 1:40 and 1:45 a.m. and T.G. was not in the bed. Lotson testified he got up and found T.G. on the couch and asked T.G. why she was not in bed with him. Lotson explained at trial that T.G. told him she was upset about the woman that owned the garage apartment. According to Lotson, T.G. "got to talking crazy[,]" Lotson told her to lie down, and T.G. started throwing pots and pans at Lotson. Lotson testified he grabbed T.G. to restrain her, she grabbed his face, and then he "took her down." Lotson testified that T.G. then bit Lotson and grabbed his testicles. After the "tussle" they both got up and T.G. began cursing and broke a window. Lotson told her she needed to leave, she tried to leave only wearing panties and Lotson's tank top, and Lotson told her she had to put clothes on.

According to Lotson, T.G. put on her clothes and left, but knocked on the door about thirty minutes or an hour later. Lotson testified that T.G. was "so intoxicated she c[ould]n't move[,]" and he then realized that she had been intoxicated before she left. He stated at trial that he was able to get her to come back inside and go back to bed, and that she told him she was sorry. T.G. said she

14

was hurting and he offered her ice but she declined. T.G. ultimately asked Lotson to take her to the hospital. Lotson agreed but asked her what she was going to tell the hospital staff about her injuries.

According to Lotson, the hospital staff spoke with T.G. outside of Lotson's presence and he left the hospital for "30 minutes at most[.]"Lotson explained at trial that when he came back, T.G. told Officer Stephens that she had been robbed at a dollar store. Lotson testified that he left after T.G.'s family arrived at the hospital. According to Lotson, T.G.'s family members started asking questions and making threatening phone calls to Lotson. T.G.'s brother called Lotson that night and asked what happened to T.G. and Lotson told him he would talk to the brother if the brother would come to Lotson's house. Lotson testified that T.G.'s brother threatened him and Lotson hung up. Lotson also testified about the dates and statements he made to law enforcement regarding the incident, however he was inconsistent when he described the dates and details thereof.

Lotson stated at trial that during the confrontation with T.G. he "[m]ost likely" caused her injuries but that he was acting in self-defense. At one point during his testimony, Lotson admitted striking T.G. with his hand "in self-defense[,]" but then shortly thereafter he stated he did not hit her. Photographs of Lotson's injuries were admitted into evidence. Lotson testified that at the time of

15

trial he was on parole until 2032 for burglary of a habitation that occurred in 2001, and he agreed that if he is convicted of this assault he will return to prison for "a long time."

The jury charge included an instruction on self-defense. The jury returned a verdict finding Lotson guilty of assault and the trial court sentenced Lotson to one year of confinement.

## LEGAL SUFFICIENCY

In his sole appellate issue, Lotson contends the evidence is legally insufficient to support his conviction because the State failed to disprove Lotson's assertion of self-defense beyond a reasonable doubt. It is the defendant's burden to produce some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Upon producing such evidence, the State has the burden of persuasion to disprove the defense. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). The State is not required to produce evidence to refute the claim but is required to prove its case beyond a reasonable doubt. *Id.* The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject the defensive issue. *Id.* at 913-14. When the jury is properly instructed on self-defense and the jury returns a guilty verdict, the jury's verdict of guilty is an implicit finding rejecting a defendant's self-defense theory. *Id.* at 914.

A person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Penal Code Ann. § 22.01(a)(1). We review all of the evidence in the light most favorable to the verdict and determine if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). Because the State carries the burden of persuasion to disprove self-defense beyond a reasonable doubt, we review a challenge to the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense under the *Jackson* standard. *Saxton*, 804 S.W.2d at 914.

In reviewing the evidence, we give deference to the jury to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We treat direct and circumstantial evidence equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The fact finder is entitled to judge the credibility of the witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

The jury heard T.G.'s testimony regarding the assault. She explained to the jury that Lotson was "controlling" and that on the evening in question, Lotson would not let her leave the apartment. The jury heard T.G. testify that she hit Lotson because he was keeping her at the apartment against her will, that they "tussled[,]" and that she hit Lotson in an attempt to fight back. The jury heard T.G. testify that Lotson punched her in the face, hit her head on the floor, and that she "blacked out" after she was punched. The jury also heard testimony from T.G. that she initially lied to the hospital staff and to law enforcement because she was afraid of Lotson. The jury heard testimony from law enforcement personnel and C.B. about the extent of T.G.'s injuries. The jury had other evidence such as photographs of T.G.'s and Lotson's injuries and heard testimony from the officers relating to their investigation. The jury also heard Lotson's testimony that he was on parole for burglary of a habitation, and his testimony about what he said happened. The jury, as the sole judge of the credibility of the witnesses, could have disbelieved Lotson's version of what transpired during the confrontation with T.G. *See, e.g.*, *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense beyond a reasonable doubt and could have found against Lotson on his self-

18

defense claim. We overrule Lotson's issue on appeal and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 24, 2015
Opinion Delivered September 23, 2015
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.